Lawrence KANE, a Class–4 creditor and asbestos-health claimant, on his own behalf and on behalf of individual Class–4 creditors and asbestos-health claimants, Appellants,

v.

JOHNS–MANVILLE CORPORATION, Manville Corporation, Manville International Corporation, Manville Export Corporation, Johns–Manville International Corporation, Manville Sales Corporation, f/k/a Johns–Manville Sales Corporation, successor by merger to Manville Buildings Materials Corporation, Manville Products Corporation, and Manville Service Corporation, Manville International Canada, Inc., Manville Canada, Inc., Manville Investment Corporation, Manville Properties Corporation, Allan–Deane Corporation, Ken–Caryl Ranch Corporation, Johns–Manville Idaho, Manville Canada Service Inc., and Sunbelt Contractors, Inc., Appellees.

In re JOHNS–MANVILLE CORPORATION, et al., Debtors.

No. 412, Docket 87–5032.

United States Court of Appeals, Second Circuit.

Argued Oct. 30, 1987.

Decided March 30, 1988.

Michael L. Goldberg, Washington, D.C. (Aaron H. Simon, Charles B. O'Reilly, George M. Rosenberg, Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg, Washington, D.C., Vern Countryman, Moraga, Cal., on the brief), for appellants.

Lowell Gordon Harriss, New York City (Laureen F. Bedell, Gregor Baer, Davis Polk & Wardwell, New York City, on the brief), and Herbert Stephen Edelman, New York City (Andrew A. Kress, Levin & Weintraub & Crames, New York City, on the brief), for appellees Johns–Manville Corp., et al.

Matthew Gluck, New York City (Fried, Frank, Harris, Shriver & Jacobson, New York City, on the brief), for appellees Legal Representative for Future Claimants.

Elihu Inselbuch, New York City (Caplin & Drysdale, New York City, on the brief), for appellee Official Committee of Asbestos Health–Related Litigants and/or Creditors.

John J. Jerome, Milbank, Tweed, Hadley, & McCloy, New York City, submitted a brief for appellee Official Committee of Unsecured Creditors.

Before NEWMAN, WINTER, and MINER, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal challenges the lawfulness of the reorganization plan of the Johns–Manville Corporation ("Manville"), a debtor in one of the nation's most significant Chapter 11 bankruptcy proceedings. Lawrence Kane, on behalf of himself and a group of other personal injury claimants, appeals from an order of the District Court for the Southern District of New York (Whitman Knapp, Judge) affirming an order of the Bankruptcy Court (Burton R. Lifland, Chief Judge) that confirmed a Second Amended Plan of Reorganization (the "Plan"). Kane and the group of 765 individuals he represents (collectively "Kane") are persons with asbestos-related disease who had filed personal injury suits against Manville prior to Manville's Chapter 11 petition. The suits were stayed, and Kane and other claimants presently afflicted with asbestos-related disease were designated as Class–4 creditors in the reorganization proceedings. Kane now objects to confirmation of the reorganization Plan on several grounds: it discharges the rights of future asbestos victims who do not have "claims" within the meaning of 11 U.S.C. § 101(4) (1982), it was adopted without constitutionally adequate notice to various interested parties, the voting procedures used in approving the Plan violated the Bankruptcy Code and due process requirements, and the Plan fails to conform with the requirements of 11 U.S.C. § 1129(a)

and (b) (1982 & Supp. IV 1986). We determine that Kane lacks standing to challenge the Plan on the grounds that it violates the rights of future claimants and other third parties, and we reject on the merits his remaining claims that the Plan violates his rights regarding voting and fails to meet the requirements of section 1129(a) and (b). The order of the District Court affirming the Bankruptcy Court's confirmation of the Plan is affirmed.

## Background

Prior to its filing for reorganization in 1982, Manville was the world's largest miner of asbestos and a major manufacturer of insulating materials and other asbestos products. Beginning in the 1960's, scientific studies began to confirm that exposure to asbestos fibers over time could cause a variety of respiratory diseases, including certain forms of lung cancer. A significant characteristic of these asbestos-related diseases is their unusually long latency period. An individual might not become ill from an asbestos-related disease until as long as forty years after initial exposure. Hence, many asbestos victims remain unknown, most of whom were exposed in the 1950's and 1960's before the dangers of asbestos were widely recognized. These persons might not develop clinically observable symptoms until the 1990's or even later.

As a result of the studies linking respiratory disease with asbestos, Manville became the target in the 1960's and 1970's of a growing number of products liability lawsuits. By the early 1980's, Manville had been named in approximately 12,500 such suits brought on behalf of over 16,000 claimants. New suits were being filed at the rate of 425 per month. Epidemiological studies undertaken by Manville revealed that approximately 50,000 to 100,000 additional suits could be expected from persons who had already been exposed to Manville asbestos. On the basis of these studies and the costs Manville had already experienced in disposing of prior claims, Manville estimated its potential liability at approximately $2 billion. On August 26, 1982, Manville filed a voluntary petition in bankruptcy under Chapter 11. From the outset of the reorganization, all concerned recognized that the impetus for Manville's action was not a present inability to meet debts but rather the anticipation of massive personal injury liability in the future. *See In re Johns–Manville Corp.*, 36 B.R. 743, 745 (Bankr.S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985).

Because future asbestos-related liability was the *raison d'etre* of the Manville reorganization, an important question at the initial stages of the proceedings concerned the representation and treatment of what were termed "future asbestos health claimants" ("future claimants"). The future claimants were persons who had been exposed to Manville's asbestos prior to the August 1982 petition date but had not yet shown any signs of disease at that time. Since the future claimants were not yet ill at the time the Chapter 11 proceedings were commenced, none had filed claims against Manville, and their identities were unknown. An Asbestos Health Committee was appointed to represent all personal injury claimants, but the Committee took the position that it represented the interests only of "present claimants," persons who, prior to the petition date, had been exposed to Manville asbestos and had already developed an asbestos-related disease. The Committee declined to represent the future claimants. Other parties in the proceedings, recognizing that an effective reorganization would have to account for the future asbestos victims as well as the present ones, moved the Bankruptcy Court to appoint a legal guardian for the future claimants. The Bankruptcy Court granted the motion, reasoning that regardless of whether the future claimants technically had "claims" cognizable in bankruptcy proceedings, *see* 11 U.S.C. § 101(4), they were at least "parties in interest" under section 1109(b) of the Code and were therefore entitled to a voice in the proceedings. The Court appointed a Legal Representative to participate on behalf of the future claimants. *See In re Johns–Manville Corp.*, 36 B.R. 743 (Bankr.S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985). Additionally, the

Court invited any person who had been exposed to Manville's asbestos but had not developed an illness to participate in the proceedings, and two such persons appeared.

The Second Amended Plan of Reorganization resulted from more than four years of negotiations among Manville, the Asbestos Health Committee, the Legal Representative, the Equity Security Holders' Committee, and other groups interested in the estate.[1] *See Manville Corp. v. Equity Security Holders Committee (In re Johns–Manville Corp.)*, 66 B.R. 517, 518–33 (Bankr.S.D.N.Y.1986). The cornerstone of the Plan is the Asbestos Health Trust (the "Trust"), a mechanism designed to satisfy the claims of all asbestos health victims, both present and future. The Trust is funded with the proceeds from Manville's settlements with its insurers; certain cash, receivables, and stock of the reorganized Manville Corporation; long term notes; and the right to receive up to 20% of Manville's yearly profits for as long as it takes to satisfy all health claims. According to the terms of the Trust, individuals with asbestos-related disease must first try to settle their claims by a mandatory exchange of settlement offers with Trust representatives. If a settlement cannot be reached, the claimant may elect mediation, binding arbitration, or traditional tort litigation. The claimant may collect from the Trust the full amount of whatever compensatory damages he is awarded. The only restriction on recovery is that the claimant may not obtain punitive damages.

The purpose of the Trust is to provide a means of satisfying Manville's ongoing personal injury liability while allowing Manville to maximize its value by continuing as an ongoing concern. To fulfill this purpose, the Plan seeks to ensure that health claims can be asserted only against the Trust and that Manville's operating entities will be protected from an onslaught of crippling lawsuits that could jeopardize the entire reorganization effort. To this end, the parties agreed that as a condition precedent to confirmation of the Plan, the Bankruptcy Court would issue an injunction channeling all asbestos-related personal injury claims to the Trust (the "Injunction"). The Injunction provides that asbestos health claimants may proceed only against the Trust to satisfy their claims and may not sue Manville, its other operating entities, and certain other specified parties, including Manville's insurers. Significantly, the Injunction applies to all health claimants, both present and future, regardless of whether they technically have dischargeable "claims" under the Code. The Injunction applies to any suit to recover "on or with respect to any Claim, Interest or Other Asbestos Obligation." "Claim" covers the present claimants, who are categorized as Class-4 unsecured creditors under the Plan and who have dischargeable "claims" within the meaning of 11 U.S.C. § 101(4). The future claimants are subject to the Injunction under the rubric of "Other Asbestos Obligation," which is defined by the Plan as asbestos-related health liability caused by pre-petition exposure to Manville asbestos, regardless of when the individual develops clinically observable symptoms. Thus, while the future claimants are not given creditor status under the Plan, they are nevertheless treated identically to the present claimants by virtue of the Injunction, which channels all claims to the Trust.

The Plan was submitted to the Bankruptcy Court for voting in June of 1986. At that time relatively few present asbestos health claimants had appeared in the reorganization proceedings. Approximately 6,400 proofs of claims had been filed for personal injuries, which accounted for less than half of the more than 16,000 persons

---

**1.** The Plan provides for nine classes of claims and interests: administrative expenses (Class 1), secured claims (Class 2), asbestos property damage claims (Class 3), present asbestos health claims (Class 4), employee and non-asbestos material claims (Class 5), other unsecured claims (Class 6), interests of preferred stockholders (Class 7), interests of common stockholders (Class 8), and interests of certain individual plaintiffs in pending lawsuits (Class 9). Future asbestos health claimants are not part of any class but are treated as "other asbestos obligations" under the Plan and are subject to the same claims handling facility as the present health claimants in Class 4.

who had filed pre-petition personal injury suits against Manville. Moreover, Manville estimated that there were tens of thousands of additional present asbestos victims who had neither filed suits nor presented proofs of claims. Manville and the creditor constituencies agreed that as many present claimants as possible should be brought into the proceedings so that they could vote on the Plan. However, the parties were reluctant to embark on the standard Code procedure of establishing a bar date, soliciting proofs of claims, resolving all disputed claims on notice and hearing, and then weighting the votes by the amounts of the claims, as such a process could delay the reorganization for many years. To avoid this delay, the Bankruptcy Court adopted special voting procedures for Class 4. Manville was directed to undertake a comprehensive multi-media notice campaign to inform persons with present health claims of the pendency of the reorganization and their opportunity to participate. Potential health claimants who responded to the campaign were given a combined proof-of-claim-and-voting form in which each could present a medical diagnosis of his asbestos-related disease and vote to accept or reject the Plan. For voting purposes only, each claim was valued in the amount of one dollar. Claimants were informed that the proof-of-claim-and-voting form would be used only for voting and that to collect from the Trust, they would have to execute an additional proof of claim establishing the actual value of their damages.

The notice campaign produced a large number of present asbestos claimants. In all, 52,440 such claimants submitted proof-of-claim-and-voting forms. Of these, 50,-275 or 95.8% approved the Plan, while 2,165 or 4.2% opposed it. In addition to these Class–4 claimants, all other classes of creditors also approved the Plan. Class 8, the common stockholders, opposed the Plan.

A confirmation hearing was held on December 16, 1986, at which Manville presented evidence regarding the feasibility and fairness of the Plan. Objections to confirmation were filed by several parties, including Kane. On December 18, 1986, the Bankruptcy Court issued a Determination of Confirmation Issues in which it rejected all objections to confirmation. *In re Johns–Manville Corp.,* 68 B.R. 618 (Bankr. S.D.N.Y.1986). With respect to Kane's challenge to the Injunction and the voting procedures, the Court relied primarily on its broad equitable powers to achieve reorganizations. Furthermore, the Court found that, based on an extensive liquidation and feasibility analysis presented by Manville at the hearing, the Plan was workable, in the best interests of the creditors, and otherwise in conformity with the requirements of 11 U.S.C. § 1129(a) and (b). The Court entered an order confirming the Plan on December 22, 1986. Kane and others appealed. By order dated July 15, 1987, the District Court affirmed the Bankruptcy Court's confirmation order "for substantially the reasons set forth" in the Bankruptcy Judge's Determination of Confirmation Issues. This appeal followed.

### Discussion

#### A. Standing

The Legal Representative of the future claimants challenges Kane's standing to bring this appeal. The Legal Representative contends that Kane is not directly and adversely affected by the confirmation order and that his appeal improperly asserts the rights of third parties, namely the future claimants. We conclude that Kane is sufficiently harmed by confirmation of the Plan to challenge it on appeal but that his appeal must be limited to those contentions that assert a deprivation of his own rights.

A person who seeks to appeal an order of the bankruptcy court must be "directly and adversely affected pecuniarily" by it. *Cosmopolitan Aviation Corp. v. New York State Department of Transportation (In re Cosmopolitan Aviation Corp.),* 763 F.2d 507, 513 (2d Cir.), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985) (quoting *Fondiller v. Robertson (In re Fondiller),* 707 F.2d 441, 442 (9th Cir.1983)). This rule of appellate standing is derived from former section 39(c) of the Bankruptcy Act of 1898, which

permitted only a "person aggrieved" to appeal an order of the bankruptcy court. 11 U.S.C. § 67(c) (1976) (repealed 1978). Although the present Bankruptcy Code does not contain any express restrictions on appellate standing, courts have uniformly held that the "person aggrieved" standard is applicable to cases under the Code. *See, e.g., Cosmopolitan Aviation Corp., supra,* 763 F.2d at 513; *In re El San Juan Hotel,* 809 F.2d 151, 154 (1st Cir.1987); *Pignato v. Dein Host, Inc. (In re Dein Host, Inc.),* 835 F.2d 402, 405 (1st Cir.1987); *Fondiller v. Robertson, supra; Palm Springs Owners Association v. Sweetwater (In re Sweetwater),* 57 B.R. 743, 746 (D.Utah 1985); 1 L. King, *Collier on Bankruptcy* ¶ 3.03[5] (15th ed. 1987). These decisions reflect the understandable concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order. *See In re El San Juan Hotel, supra,* 809 F.2d at 154; *Fondiller v. Robertson, supra,* 707 F.2d at 443. Hence, a party to the bankruptcy proceedings is permitted to appeal a particular order only if the order directly affects his pecuniary interests.[2]

■ We are satisfied that Kane is a "person aggrieved" by the Bankruptcy Court's order confirming the Plan. As a general rule, creditors have standing to appeal orders of the bankruptcy court disposing of property of the estate because such orders directly affect the creditors' ability to receive payment of their claims. *See, e.g., Shaw & Levine v. Gulf & West-*

*ern Industries, Inc. (In re Bohack Corp.),* 607 F.2d 258, 262 (2d Cir.1979); *Certified Associates, Inc. v. Foundation Properties, Inc. (In re Realty Foundation, Inc.),* 75 F.2d 286, 287–88 (2d Cir.1935). A plan of reorganization adversely affects creditors in this way because it allocates estate assets among creditor groups and determines the extent to which each creditor is to be paid. *See Brady v. Andrew (In re Commercial Western Finance Corp.),* 761 F.2d 1329, 1335 (9th Cir.1985).[3] In the present case, Kane, a creditor, has economic interests that are directly impaired by the Plan. His recourse to the courts to pursue damages for his injuries is limited by the settlement procedures mandated by the Trust, he is not entitled to punitive damages, and, ultimately, his recovery is subject to the Trust's being sufficiently funded. Kane might receive more under this Plan than he would receive in a liquidation. However, he might do better still under alternative plans. Since the Second Amended Plan gives Kane less than what he might have received, he is directly and adversely affected pecuniarily by it, and he therefore has standing to challenge it on appeal.

■ Having determined that Kane may appeal the Bankruptcy Court's confirmation order, we must now decide whose rights Kane will be permitted to assert. *See Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976) (standing involves two-step inquiry; first, whether litigant has been sufficiently injured and second, whether he is the proper proponent of the rights he seeks to assert).

---

**2.** This standing limitation is more exacting than the constitutional case or controversy requirement imposed by Article III, for under the constitutional "injury in fact" test, the injury need not be financial, *see, e.g., Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed. 2d 636 (1972), and need only be "fairly traceable" to the alleged illegal action, *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed. 2d 556 (1984).

**3.** In this respect, the creditor differs from the "hopelessly insolvent debtor" who is not permitted to challenge orders affecting the estate because the estate will go entirely to the creditors, and the debtor has no interest in what happens to it. *See Cosmopolitan Aviation Corp., supra,*

763 F.2d at 513; *Norway National Bank v. Goodwin's Discount Furniture, Inc. (In re Goodwin's Discount Furniture, Inc.),* 16 B.R. 885, 887–88 (1st Cir.Bankr.App.1982). Additionally, the creditor opposing a plan of reorganization is distinguishable from marginal parties in the bankruptcy proceedings who face potential harm incident to the bankruptcy court's orders but are not directly and pecuniarily affected by them. *See, e.g., Fondiller v. Robertson, supra,* 707 F.2d at 443 (debtor's wife may not appeal order appointing special counsel even if counsel may eventually sue wife); *In re El San Juan Hotel, supra,* 809 F.2d at 155–56 (former trustee may not appeal order granting leave to United States to sue him for breach of fiduciary duties).

It is clear that some of Kane's claims are based exclusively on the rights of third parties. He asserts five claims:

(1) The Injunction violates the Bankruptcy Code because it affects the rights of future asbestos victims who do not have "claims" within the meaning of 11 U.S.C. § 101(4).[4]

(2) The Injunction violates due process because future claimants were given inadequate notice of the discharge of their rights.

(3) The special voting procedures for Class 4 violate due process because present claimants were given inadequate notice of the hearing at which the voting procedures were adopted.

(4) The Class–4 voting procedures violate the Code because persons were permitted to vote before their claims were "allowed" pursuant to 11 U.S.C. § 502 (1982 & Supp. IV 1986), claims were arbitrarily assigned a value of one dollar each for voting purposes, and creditors were denied the opportunity to object to claims.

(5) The Plan fails to meet the requirements of 11 U.S.C. § 1129(a) and (b) because it was not proposed in good faith, it is not in the best interests of all creditors, it is not feasible, and it is not fair and equitable with respect to dissenting classes.

Kane does not dispute that his challenges to the Injunction (claims (1) and (2)) assert the constitutional and statutory rights only of the future claimants. Additionally, we note that claim (3) regarding notice of the voting procedures asserts only third-party rights. Kane was present at the June 23, 1986, hearing at which the voting procedures were adopted and had an opportunity to object, which he concedes that he exercised. Kane's claim with respect to notice of voting procedures is that notice was inadequate only as to present health claimants (other than himself) who were not informed of the special voting procedures and might have wanted to object. The question we must consider is whether on this appeal of the confirmation order, Kane may assert claims of these third parties. We conclude that he may not.

Generally, litigants in federal court are barred from asserting the constitutional and statutory rights of others in an effort to obtain relief for injury to themselves. *Warth v. Seldin,* 422 U.S. 490, 499, 509, 95 S.Ct. 2197, 2205, 2210, 45 L.Ed.2d 343 (1975); *see Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 804–05, 105 S.Ct. 2965, 2971, 86 L.Ed.2d 628 (1985); *Singleton v. Wulff, supra,* 428 U.S. at 114, 96 S.Ct. at 2874. Though this limitation is not dictated by the Article III case or controversy requirement, the third-party standing doctrine has been considered a valuable prudential limitation, self-imposed by the federal courts. In *Singleton,* the Supreme Court articulated two important policies justifying such a limitation: "first, the courts should not adjudicate [third-party] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not. Second, third parties themselves usually will be the best proponents of their own rights." 428 U.S. at 113–14, 96 S.Ct. at 2874 (citations omitted). The Supreme Court has recognized that under some special circumstances these concerns are not present. Thus, where the litigant's interests are closely allied with those of the third parties, stand-

---

4. Kane also challenges the Injunction on the ground that it grants a discharge to non-debtor parties, who are not entitled to the protection of Chapter 11, specifically Manville's insurers and certain Manville subsidiaries. We have recently determined that the insurers may lawfully be protected from asbestos-related claims. *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89 (2d Cir.1988). With respect to the non-debtor subsidiaries, it is true that they may not lawfully be protected from creditors' claims if they are separate, viable entities in which Manville can shield its assets, *see In re Unishops, Inc.,* 494 F.2d 689, 690 (2d Cir.1974); *Feldman v. Trustees of Beck Industries, Inc. (In re Beck Industries, Inc.),* 479 F.2d 410, 416 (2d Cir.), *cert. denied,* 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973), but that is not the case here. Manville has represented that the subsidiaries either have been sold and their proceeds made part of the debtor's estate or are foreign corporations owned entirely by the Trust. Kane has submitted no evidence to the contrary.

ing is permitted because the litigant is likely to be as effective a proponent of the third-party rights as the third parties themselves. *E.g., Singleton v. Wulff, supra,* 428 U.S. at 117–18, 96 S.Ct. at 2876 (plurality opinion) (physicians may assert patients' privacy rights); *Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) (same); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–36, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925) (owners of private school may assert rights of potential pupils and their parents). Furthermore, where third parties are unable to assert their own rights, current litigants are allowed to assert third-party claims that might otherwise remain unvindicated. *See Singleton v. Wulff, supra,* 428 U.S. at 115–16, 96 S.Ct. at 2875 (plurality opinion); *id.* at 125–26, 96 S.Ct. at 2879–80 (Powell, J., concurring in part and dissenting in part); *NAACP v. Alabama,* 357 U.S. 449, 459–60, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). However, where these special considerations are absent, a litigant is restricted to asserting his own constitutional and statutory rights. *See Warth v. Seldin, supra.*

The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context. Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself. Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights. *E.g., Kremer v. Clarke (In re Frank Fehr Brewing Co.),* 268 F.2d 170, 179 (6th Cir. 1959), *cert. denied,* 362 U.S. 963, 80 S.Ct. 880, 4 L.Ed.2d 878 (1960) ("[i]f the creditors are willing to accept less than they might

otherwise be entitled to, it is not for the common stockholders to insist that they not be permitted to do so"); *In re Evans Products Co.,* 65 B.R. 870, 875 (S.D.Fla.1986) (debtors lack standing to raise the rights of wrongly classified creditors as a means to attack the overall reorganization plan); *In re Snyder,* 56 B.R. 1007, 1010–11 (N.D.Ind. 1986) (debtor may not challenge plan on ground that notice was inadequate to creditors); *see also Holywell Corp. v. Bank of New York,* 59 B.R. 340, 349 (S.D.Fla.1986); *Palm Springs Owners Association v. Sweetwater (In re Sweetwater), supra,* 57 B.R. at 746–47; *In re Adana Mortgage Bankers, Inc.,* 14 B.R. 29, 30 (Bankr.N.D. Ga.1981).

Prudential concerns weigh heavily against permitting Kane to assert the rights of the future claimants in attacking the Plan. First, Kane's interest in these proceedings is potentially opposed to that of the future claimants. Both Kane and the future claimants wish to recover from the debtor for personal injuries. To the extent that Kane is successful in obtaining more of the debtor's assets to satisfy his own claims, less will be available for other parties, with the distinct risk that the future claimants will suffer. Thus, we cannot depend on Kane sincerely to advance the interests of the future claimants. Second, the third parties whose rights Kane seeks to assert are already represented in the proceedings. Though it is true, as Kane points out, that the future claimants themselves are not before the Court, they are ably represented by the appointed Legal Representative. Therefore, it is not necessary to allow Kane to raise the future claimants' rights on the theory that these rights will be otherwise ignored. The Bankruptcy Court appointed the Legal Representative specifically for the purpose of ensuring that the rights of the future claimants would be asserted where necessary. Certainly as between Kane and the Legal Representative, there is no question that the latter is the more reliable advocate of the future claimants' rights, and we may confidently leave that task entirely to him.[5]

**5.** Since the appointment of the Legal Represent-      ative in this case, two other courts have deter-

Finally, and significantly, the Legal Representative has expressly stated in this appeal that he does not want Kane to assert the future claimants' rights. This is precisely the situation where the third-party standing limitation should apply. *See Singleton v. Wulff, supra,* 428 U.S. at 114, 96 S.Ct. at 2874.

For similar reasons, Kane may not assert the rights of present claimants who he contends were given inadequate notice of the June 1986 hearing at which the special Class–4 voting procedures were adopted. Those Class–4 creditors are in the proceedings and could have objected to the Plan if they had wanted to, but they did not. In fact, the overwhelming majority of Class 4 voted in favor of the Plan. It is not for Kane to insist that other Class–4 members should have received more notice than what apparently satisfies them. *See In re Snyder, supra,* 56 B.R. at 1010–11 (debtor may not challenge plan on ground that notice was inadequate to creditors).

Kane argues that he ought to be permitted at least to challenge the Injunction because his claim is "inextricably bound up with" the rights of the future claimants. *See Singleton v. Wulff, supra,* 428 U.S. at 114, 96 S.Ct. at 2874. Kane reasons that his own recovery from the Trust depends upon Manville's financial stability, which in turn could be jeopardized by a future claimant's successful challenge to the Injunction. If future claimants are not bound by the Injunction, then, Kane predicts, they will sue Manville's operating entities directly, Manville will be unable to meet its funding commitments to the Trust, and Kane will lose his rights to compensation under the Plan. Kane therefore contends that he should be able to test the validity of the Injunction as to the future claimants now so as to avoid a successful challenge detrimental to him in the future.

Though we recognize that future claimants may at some later point attempt to challenge the Injunction, we do not believe that Kane's interests are so "inextricably bound up with" those of the future claimants in such a suit as to warrant third-party standing. Even if we assume that future claimants would at some later time be permitted to advance a position contrary to that taken by the Legal Representative in this litigation and assume further that the future claimants' objections to the Injunction are upheld, matters upon which we express no opinion, Kane has failed to show a sufficient likelihood that he would be harmed by such a successful challenge. The flaw in Kane's analysis is that it assumes that an onslaught of future victims' suits could impair the Trust before Kane is paid. Such is not the case. Kane and the other present claimants are, by definition, currently afflicted with asbestos disease. They may all initiate claims against the Trust immediately after confirmation. Resolution and payment of these claims is expected to take approximately ten years. The bulk of the future victims, in contrast, are not presently afflicted with disease. Many of them will not become ill until well into the 1990's or later. While some of the last of the present claimants may overlap with the first of the future claimants in presenting their damage claims, the claims of these groups will be presented essentially consecutively. By the time enough future claimants develop asbestos-related disease, challenge the Injunction, and, if successful, collect damages directly from Manville to an extent sufficient to impair the long-term funding of the Trust, Kane will have had years to enforce his own claims. Kane's concern that he will be precluded from collecting from the Trust because of future claimants' suits against Manville is therefore too speculative a basis on which to grant third-party standing.

We have so far determined that Kane does not have standing to challenge the Injunction nor to assert the rights of other Class–4 members in challenging the notice

---

mined in the context of asbestos-related bankruptcy proceedings that future claimants are "parties in interest" entitled to participate and that they can best be represented by their own appointed guardian rather than by creditors al-

ready in the proceedings. *See In re Amatex Corp.,* 755 F.2d 1034, 1041–44 (3d Cir.1985); *In re UNR Industries, Inc.,* 46 B.R. 671 (Bankr.N.D. Ill.1985).

**646**

of voting procedures. In contrast, Kane does have standing to assert his remaining claims regarding the validity of the voting procedures and compliance with the requirements of section 1129(a) and (b); these claims allege violations of Kane's own rights under the Code.

## B. Voting Procedures

■ Consideration of Kane's challenge to the voting procedures requires a brief outline of pertinent provisions of the Bankruptcy Code. A plan of reorganization must either be accepted by each impaired class of claims or interests, 11 U.S.C. § 1129(a)(8) (1982 & Supp. IV 1986), or meet certain rigid requirements with respect to each non-accepting class, 11 U.S.C. § 1129(b) (so-called "cram down" provision). A class of creditors has accepted a plan under the Code "if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan." 11 U.S.C. § 1126(c) (1982). Claims are "allowed" in the amount filed unless they are objected to by a party in interest, including the debtor or another creditor. 11 U.S.C. § 502(a); Bankruptcy Rule 3001(f). If a party in interest wishes to object to a claim, notice of the objection must be mailed to the claimant at least thirty days prior to a hearing at which the bankruptcy court determines the validity of the claim and the amount allowed. 11 U.S.C. § 502(b); Bankruptcy Rule 3007. However, objections to claims need not be finally resolved before voting on a plan may occur. Bankruptcy Rule 3018(a) provides that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting a plan."

Kane contends that the special Class–4 voting procedures adopted by the Bankruptcy Court violated his rights under the Code in several ways. First, since proofs of claims and votes were simultaneously solicited from present claimants in a combined mailing form, no creditor had an opportunity to object to the Class–4 members' claims before their votes were cast. Kane argues that this lack of opportunity to object prejudiced him because some of the claims might have been invalid and counting votes of those with invalid claims diluted his own vote. Second, Kane argues that the Bankruptcy Court improperly "allowed" claims for voting purposes in the arbitrary amount of one dollar, thereby depriving him of the opportunity to vote his claim weighted in the amount indicated in his proof of claim. By weighting all Class–4 votes equally, the Bankruptcy Court, in Kane's view, failed to adhere to the Code's voting scheme whereby a minority of class members with just over one third of the value of the total claims may reject a plan. Finally, Kane suggests that by assigning the one dollar value to all of the claims, the Bankruptcy Court might have discouraged Plan opponents with large claims from casting their votes since such opponents might have believed that, without the benefit of weighted voting, their opposition to the Plan would be futile.

Appellees respond that the Code is sufficiently flexible to accommodate the creative voting scheme used in this case. They argue primarily that the Code evinces a strong preference for facilitating reorganizations and that strict adherence to a weighted voting scheme would have been impractical in this case. Appellees point out that either the reorganization would have been delayed for years while the dollar value of every disputed health claim was determined or the vote would have been taken without contacting present health claimants other than the few who had voluntarily submitted proofs of claims, leaving a large group of important creditors disenfranchised. Additionally, appellees rely on Bankruptcy Rule 3018(a) as express authority for temporarily allowing claims for voting purposes only. Kane responds that Rule 3018(a) is not applicable because it permits temporary allowance only after formal filing of an objection and a hearing on the disputed claims, neither of which occurred in this case.

We need not decide whether the special Class–4 voting procedures violate the Code because, in view of the outcome of the vote, the alleged irregularities were at most harmless error. Bankruptcy Rule 9005 adopts for the purposes of bankruptcy proceedings Fed.R.Civ.P. 61, which provides that "no error or defect in any ruling or order or in anything done or omitted by the court" is ground for disturbing an order "unless refusal to take such action appears to the court inconsistent with substantial justice" and the court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *See River Hills Associates, Ltd. v. River Hills Apartments Fund (In re River Hills Apartments Fund)*, 813 F.2d 702, 706–07 (5th Cir.1987). The harmless error rule has been invoked in the bankruptcy context where procedural irregularities, including alleged errors in voting procedures, would not have had an effect on the outcome of the case. *See Gilman v. Davis (In re State Thread Co.)*, 126 F.2d 296, 301 (6th Cir.1942) (voting); *In re Flexible Conveyor Co.*, 156 F.Supp. 164, 174 (N.D.Ohio 1957) (voting); *Ferguson v. Central National Bank (In re Ferguson)*, 67 B.R. 246, 250 (D.Kan.1986) (discovery); *In re Mandalay Shores Cooperative Housing Association, Inc.*, 63 B.R. 842, 852 (N.D.Ill.1986) (notice); *cf. IIT v. Lam (In re Colorado Corp.)*, 531 F.2d 463, 470 (10th Cir.1976) (denial of creditors' right to vote for trustee was not harmless error where "their votes could have affected and probably would have altered, the outcome").

None of the procedures that Kane contends were required would have changed the outcome of the vote. With respect to denial of the opportunity to object to the Class–4 claims before they were voted, no substantial rights were impaired because Kane is unable to show that, had he been afforded a chance to object, any of the present health claims would have been excluded. The only objection Kane contends that he would have asserted is that the combined proof-of-claim-and-voting form approved by the Bankruptcy Court permitted a filing supported only by a written medical diagnosis of an asbestos-related condition without evidence that the claimant was exposed to Manville's product, as opposed to the product of some other company. However, it is clear from the record that this objection would have been unavailing. The combined proof-of-claim-and-voting form required anyone who had not already filed a lawsuit against Manville to submit a diagnosis of his disease *and* to represent that he had been exposed to Manville's product. Such a representation would have sufficed to warrant accepting the claim for voting purposes, especially in the absence of any particularized contrary evidence from Kane. In any event, since 95.8% of those Class–4 members who voted approved the Plan, the result would not have been different unless more than 90% of those who voted in favor had invalid claims, an improbable circumstance.[6]

Similarly, Kane was not prejudiced by the assignment of a one dollar value to each claim. If we make the reasonable assumption that the percentage of claims that are valid is the same for "yes" votes and "no" votes, then the "no" votes would have to be at least ten times larger, on average, than the "yes" votes in order to change the result from what occurred with equal weighting of each vote.[7] Nothing in

---

6. With all votes weighted equally, the number of "yes" votes would have to be less than two thirds of the total Class–4 votes cast in order for the Plan to lack approval by holders of two thirds of the aggregate value of the claims of this class. 11 U.S.C. § 1126(c). Since 2,165 opposed the Plan, the total of valid votes would have to be less than 6,495 in order to prevent the "yes" votes from constituting two thirds of the total votes cast; if the total is at least 6,495, the "yes" votes would be at least 4,330 (6,495—2,165), which is two thirds of 6,495. In order to reduce the total vote from the 52,440 cast to less than 6,495, the "yes" votes would have to be reduced from the 50,275 cast to less than 4,330 (6,495—2,165). To accomplish this result would have required invalidation of at least 91.4% of the "yes" votes (50,275—4,330 = 45,945, which is 91.4% of 50,275).

7. The aggregate value of the "no" votes would have to exceed one third of the aggregate value of all Class–4 claims in order to prevent this class from approving the Plan. 11 U.S.C. § 1126(c). Since 2,165 votes opposed the Plan and 50,275 favored it, the multiple by which the average value of each "no" vote would have to exceed the average value of each "yes" vote in

**648**

the record gives any indication that such a large variation in claims existed, much less that the "no" votes were the larger claims. Indeed, it is safe to assume that if the procedures insisted upon by Kane had been used, all the votes would have still been weighted roughly the same since significant variations would not likely occur in the damages sustained by similar groups of people from similar kinds of injuries. Even if Kane is correct that some Plan opponents with larger claims were discouraged from voting, no prejudice occurred. Even if we make the unlikely assumption, favorable to Kane, that Plan opponents in Class 4, on average, had claims twice the size of the claims of Plan proponents, the number of "no" votes in this class would have had to increase nearly six times, from 2,165 to 12,569, in order to change the result.[8] If there really were 12,569 Class-4 claimants opposed to the Plan, it is highly unlikely that 10,404 or 83% of them would have been discouraged from voting.

### C. Section 1129 Requirements

A plan of reorganization may normally be confirmed only if all of the requirements of 11 U.S.C. § 1129(a) are met. However, if the requirement of subsection 1129(a)(8), that all impaired classes accept the plan, is not met, a plan may still be confirmed if it meets the remaining section 1129(a) requirements and also meets the requirements of section 1129(b). Kane asserts that the Bankruptcy Judge erred in finding that the Plan met some of these requirements. Specifically, Kane argues that the Plan did not comply with "applicable provisions" of the Code (subsection 1129(a)(1)), was not proposed in good faith (subsection 1129(a)(3)), was not in the best interests of dissenting creditors (subsection 1129(a)(7)), was unfeasible (subsection 1129(a)(11)), and

was not fair or equitable to dissenting classes (subsection 1129(b)). In assessing these contentions, we bear in mind that the Bankruptcy Judge's findings of fact may not be overturned unless clearly erroneous. Bankruptcy Rule 8013. We conclude that the Bankruptcy Judge was entitled to find that the section 1129 requirements were met.

Subsection 1129(a)(1) requires that the plan "compl[y] with the applicable provisions of this title." Kane argues that this requirement was not met because the Injunction and the Class-4 voting procedures violated the Code. We have already determined that Kane does not have standing to argue that the Injunction violates the Code because in this challenge he asserts only the rights of third parties. Moreover, we have concluded that any violation of the voting provisions was at most harmless error. Where Code violations are so insubstantial that they constitute harmless error, they do not warrant overturning an entire plan of reorganization under subsection 1129(a)(1). Otherwise, this subsection would make the salutary harmless error rule inapplicable to plan confirmations under Chapter 11. Such a result is inconsistent with Bankruptcy Rule 9005, applying the harmless error rule to "cases under the Code" without exception, and with the well established principle that relief under the bankruptcy laws is not to be withheld because of technicalities. *See Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). Finally, the legislative history of subsection 1129(a)(1) suggests that Congress intended the phrase "applicable provisions" in this subsection to mean provisions of Chapter 11 that concern the form and content of reorganization plans: "Paragraph (1) [of subsection 1129(a)] requires that the plan comply with the appli-

---

order to change the result can be derived from the formula, $2,165(p)(x) = \frac{1}{3}(2,165(p)(x) + 50,275(p))$, where "p" equals the percentage of valid claims and "x" equals the multiple. In this equation, $x = 11.6$. Because we have assumed that the percentage of claims that are valid is the same for "yes" votes and "no" votes (*i.e.,* "p" is the same throughout the equation), the multiple "x" is unaffected by the actual percentage of the claims that are valid.

8. If the average value of an opponent's claim is twice the value of a proponent's claim, the number of opponents needed to have Class 4 oppose the Plan for lack of approval by holders of two thirds of the aggregate value of claims may be derived from the formula, $2(x) = \frac{1}{3}(50,275 + 2(x))$, where "x" equals the number of opponents. In this equation, "x" equals 12,569.

cable provisions of chapter 11, such as section 1122 and 1123, *governing classification and contents of plan."* S.Rep. No. 95–989, 95th Cong., 2d Sess. 126 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5912 (emphasis added). It is doubtful that violations of Code provisions unrelated to the form and content of a plan, such as voting procedures, implicate subsection 1129(a)(1) at all.

■ Subsection 1129(a)(3) requires that the plan be proposed "in good faith and not by any means forbidden by law." The good-faith test means that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected.'" *Koelbl v. Glessing (In re Koelbl),* 751 F.2d 137, 139 (2d Cir.1984) (quoting *Manati Sugar Co. v. Mock,* 75 F.2d 284, 285 (2d Cir.1935)); *see also Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.),* 709 F.2d 762, 765 (1st Cir.1983) (to be proposed in good faith, plan "must bear some relation to the statutory objective of resuscitating a financially troubled corporation"). We are satisfied that Manville honestly believed that it was in need of reorganization and that the Plan was negotiated and proposed with the intention of accomplishing a successful reorganization. *See In re Johns–Manville Corp.,* 36 B.R. 727, 741 (Bankr.S.D.N.Y.), *leave to appeal denied,* 39 B.R. 234 (S.D.N.Y.), *reh'g denied,* 39 B.R. 998 (S.D.N.Y.), *mandamus denied,* 749 F.2d 3 (2d Cir.1984). The Bankruptcy Court found that "Johns–Manville was and remains 'a financially besieged enterprise in desperate need of reorganization of its crushing real debt, both present and future.'" 68 B.R. at 632 (quoting *In re Johns–Manville Corp., supra,* 36 B.R. at 741). This finding is not clearly erroneous. *See Koelbl v. Glessing (In re Koelbl), supra,* 751 F.2d at 139 (applying clearly erroneous standard to question of good-faith proposal of reorganization plan).

Subsection 1129(a)(7) incorporates the former "best interest of creditors" test and requires a finding that each holder of a claim or interest either has accepted the plan or has received no less under the plan than what he would have received in a Chapter 7 liquidation. At the confirmation hearing, Manville presented an extensive liquidation analysis based on documentary evidence and expert testimony. Kane submitted no evidence. The Bankruptcy Judge accepted Manville's proof that all creditors and equity holders would receive substantially more under the Plan than they would have received if Manville were liquidated. In particular, the Bankruptcy Court found that Class–4 present asbestos health claimants would receive 100% on their claims under the Plan but would have received only 56%–81% in a liquidation. These findings are not clearly erroneous. *See United Properties, Inc. v. Emporium Department Stores, Inc.,* 379 F.2d 55, 63–64 (8th Cir.1967) (applying clearly erroneous standard to former "best interests" test).

■ Subsection 1129(a)(11) requires that the plan is not likely to be followed by liquidation or the need for further financial reorganization. As the Bankruptcy Court correctly stated, the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed. *See Prudential Insurance Co. v. Monnier (In re Monnier Bros.),* 755 F.2d 1336, 1341 (8th Cir.1985); *In re Wolf,* 61 B.R. 1010, 1011 (Bankr.N.D.Iowa 1986). As with the liquidation analysis, Manville presented extensive evidence on feasibility at the confirmation hearing, while Kane presented no evidence. The Bankruptcy Judge found that "the Debtor's reasonable and credible projections of future earnings have established that the reorganized corporation is unlikely to face future proceedings under this title." 68 B.R. at 635. With specific reference to the Trust, the Court found that "[t]he evidence submitted by the Debtor ... provides a reasonable estimation, based upon known present claimants and reasonable extrapolations from past experience and epidemiological data, of the number and amount of asbestos-related claims that the AH Trust will be required to satisfy. The Debtor has also established that the Trust will, in fact, meet this burden." *Id.*

Kane argues that the Bankruptcy Court's finding of feasibility was incorrect because the Trust is inadequately funded and will not be able to satisfy the claims against it. He contends that accepting Manville's estimate of $26,000 as the average liquidation cost of present claimants' suits, the Trust will need $1.352 billion to pay the 52,000 present claimants who filed claims. Since the Trust, according to Kane, is funded through the first five years with only $1.104 billion, he argues that it will fall $248 million short of paying the present claimants. There are two major errors in Kane's analysis. First, his account of the Trust's short-term funding is incorrect because he omits the value of Manville stock, which Kane estimates to be worth from $80.8 million to $146.4 million and which Manville estimates to be worth from $323 million to $585 million. Second, and more importantly, Kane completely ignores the long-term funding of the Trust. Not all present asbestos claims must be paid immediately upon confirmation, and many will not be liquidated and presented for payment even within the first five years. More likely, payment of present health claims will be spread out over roughly a ten-year period. In years six through ten, the Trust will receive annual payments of $75 million as well as up to 20% of Manville's yearly profits. This additional funding will be more than sufficient to pay the few present claimants who might not recover from the Trust's assets accumulated over the first five years. Moreover, since the $75 million annual payments continue through year 27 and the 20% profit-sharing continues for as long as necessary to pay all claims, the Trust will also be adequate to pay the claims of the future asbestos victims. The Bankruptcy Court's finding that the Plan offers reasonable assurance of success in this regard is not clearly erroneous. *See Prudential Insurance Co. v. Monnier (In re Monnier Bros.), supra*, 755 F.2d at 1341 (applying clearly erroneous standard to feasibility determination); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1377 (9th Cir.1985) (same).

Under section 1129(b), the so-called "cram down" provision, even if all impaired classes do not accept the plan, it may nonetheless be confirmed as long as "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." To be "fair and equitable," a plan that gives anything to the holder of a claim or interest junior to a non-accepting class of unsecured creditors must ensure that the unsecured creditors in the non-accepting class receive "property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. § 1129(b)(2)(B). It is clear from this language that a plan need only be fair and equitable to classes that voted against the plan. Kane argues that because the special Class–4 voting procedures were unlawful, Class 4 should be deemed to have rejected the Plan, and section 1129(b) should apply. However, we have already determined that even if the voting procedures did not conform rigidly to the Code, any error was harmless since the result of the vote was unaffected. Since Class 4 accepted the Plan, the requirements of section 1129(b) need not be fulfilled with respect to that class.

The order of the District Court affirming the Bankruptcy Court's confirmation order is affirmed.

MINER, Circuit Judge, concurring:

Since the bankruptcy judge was empowered to estimate the claims of the Class–4 creditors, and did not abuse his discretion in doing so, I perceive no need to apply a harmless error analysis or to employ mathematical calculations to sustain the voting procedures adopted.

Acceptance of a plan of reorganization occurs when "such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan." 11 U.S.C. § 1126(c). For the purpose of allowance, a bankruptcy court must estimate "any contingent or

unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). Moreover, the court is authorized, after objections and notice and hearing, to allow a claim temporarily "in an amount which the court deems proper for the purpose of accepting or rejecting a plan." Bankruptcy Rule 3018(a).

By the time of the June 23, 1986 hearing held to consider the Disclosure Statement and the Second Amended and Restated Plan of Reorganization filed by the debtors, approximately 6,400 proofs of claim had been submitted by asbestos health claimants for personal injuries. It was apparent at that juncture in the proceedings that the administration of the case would be delayed unduly if each of those unliquidated claims were to be considered separately for allowance purposes. Referring to the number of actual lawsuits then pending on behalf of asbestos health claimants, the bankruptcy judge observed that more than 16,500 hearings would be necessary "to treat each individual claim discretely." Joint App. at 697. In the words of the debtors' attorney, "the practical effect of having to value each and every claim individually would ... be delay[ ] beyond anybody's reasonable expectations and probably lifetime." *Id.* at 730. The problem of delay was even more apparent at the conclusion of the notice campaign, when proof-of-claim-and-voting forms had been received from 52,440 claimants.

Under the circumstances, the bankruptcy judge properly exercised his authority to estimate each of the claims at $1.00. The asbestos health claims were especially suited to estimation because of the uncertain nature of both liability and damages. Moreover, the very purpose of the reorganization would be defeated if each claim were to be considered separately for purposes of allowance and voting. Indeed, the delay entailed by such an approach would not only be fatal to the entire plan but might very well be fatal to any recovery for the claimants. Section 502(c)(1) is designed to forestall these types of consequences.

In any event, the assignment of a value of $1.00 per claim is merely the temporary allowance contemplated by Rule 3018(a), with the right reserved to each claimant to seek actual damages from the Asbestos Health Trust. Although the Rule calls for objections to the claims, followed by notice and hearing, before temporary allowances for voting purposes are made, there was substantial compliance with this requirement here. The debtors' attorney objected to the Class–4 claims at the June 23 hearing: "I should say essentially all of the claims are unliquidated and/or contingent and they are also disputed, because until finally liquidated, the amount of the claim is a disputed item." Joint App. at 638. The attorney for Lawrence Kane *et al.* responded and noted his opposition to the proposed voting procedure: "Now, what this proposal does is essentially discriminate[ ] among the voting class because they each have different value[s] of the case.... Proof[s] of Claims with amounts should be determined and this Court should have a hearing on it." *Id.* at 697. The Kane attorney also had notice and an opportunity to be heard on the voting issue at the December 16, 1986 hearing on confirmation of the Plan. *Id.* at 1053–63.

In sum, I am of the opinion that the specific Code provisions referred to above are sufficient to support the voting procedures approved by the bankruptcy judge. Those procedures not only comply with the Code in all respects but also serve to further the overall purposes of Chapter 11 in cases of this nature. I concur with the reasoning of the majority opinion in all other respects, and, of course, with the conclusions reached therein.