FEINBERG, Circuit Judge,
concurring in part and dissenting in part:
Judge Newman’s opinion for the majority in this important case is characteristically thoughtful and comprehensive. I concur in much of it. I cannot agree, however, with the majority’s holding that the Trial Courts’ approval of the treatment of the health claimants in the restructured Man-ville Personal Injury Settlement Trust (the Trust) was improper under both Rule 23 of the Federal Rules of Civil Procedure and the bankruptcy laws. As discussed below, I believe that the Trial Courts’ ruling violated neither Rule 23 nor the bankruptcy laws.
I.
The factual background to these appeals is stated in the majority’s thorough opinion, and the following is simply a brief statement of what I regard as the most relevant facts. This case is highly unusual, if not unique. See In re Johns-Manville Corp., 801 F.2d 60, 70 (2d Cir.1986) (Oakes, J., dissenting) (“no more complex reorganization has ever come before any bankruptcy court ... ”). The Johns-Manville Corporation, over ten years ago, faced an estimated potential liability of about $2 billion from current and future victims of asbestos-related deaths and injuries. Johns-Manville sought relief under the bankruptcy laws and became “a debtor in one of the nation’s most significant Chapter 11 bankruptcy proceedings.” Kane v. Johns-Manville Corp., 843 F.2d 636, 638 (2d Cir.1988). In December 1986, after extensive legal proceedings [1] and much negotiation, a plan of reorganization (the Plan) was confirmed by the Bankruptcy Court. In July 1987, the United States District Court for the Southern District of New York affirmed the order of confirmation, and in March 1988, this Court affirmed the district court. Id. at 638-41.
The cornerstone of the Plan was the Trust, a payment “mechanism designed to satisfy in full the claims of all asbestos health claimants, both present and future.” Kane, 843 F.2d at 640. Present health claimants were “persons who, prior to the [Chapter 11] petition date, had been exposed to Manville asbestos and had already *752 developed an asbestos-related disease.” Id. at 639. Future health claimants “were persons who had been exposed to Man-ville’s asbestos prior to the August 1982 petition date but had not yet shown any signs of the disease at that time.” Id. The claims of present health claimants were designated in the Plan as Class-4 claims. The question whether the Plan could also provide for future, unknown health claimants by designating them as Class-4 creditors under the Plan was never resolved because it was and remains unclear “whether they constitute creditors who hold claims within the meaning of section 101(4)” of the Bankruptcy Code. In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. 710, 839 (E. & S.D.N.Y.1991). See also Kane, 843 F.2d at 639. Although not Class-4 creditors under the Plan, the future claimants were defined as Beneficiaries under the Trust: What bankruptcy law may not have permitted (providing for future claimants), trust law most definitely did permit. In any event, as this Court has pointed out, “future asbestos-related liability was the raison d’etre of the Manville reorganization____” Id.
Under the Plan, the Trust was to be funded from several sources for as long as it might take to satisfy all asbestos disease claims. The Trust was created by the Man-ville Personal Injury Settlement Trust Agreement (the Trust Agreement), which contained an Annex B that established a Claims Resolution Procedure. One of the many “procedures” set forth in Annex B specified that claims would be processed “in order of initial filing ... on a first-in-first-out basis.”
The Plan was a first-rate achievement in a very difficult situation, as the Trial Courts recognized. See In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. at 841 (“The Plan undertook to resolve a complex reorganization in a novel and creative fashion. Such efforts should be encouraged____”). The Plan allowed Johns-Manville to continue to operate as a reorganized debtor. At the same time, the Plan offered, through the Trust mechanism, the promise of payment in full over a period of years on the liquidated claims of all health claimants, both present and future. Nevertheless, it was clear when the Plan was adopted that “the parties were embarking into unknown territory and that the operation of the Manville claims facility might require adjustments and changes as additional knowledge and experience were gained.” In re Johns-Manville Corp., 920 F.2d 121, 129.[2]
Although the Bankruptcy Court confirmed the Plan in December 1986, the Trust did not become operational, in the sense of paying claims, until November 1988. Marianna S. Smith, Resolving Asbestos Claims: The Manville Personal Injury Settlement Trust, 53 L. & Contemp.Probs. 27, 31 (Autumn 1990). It soon became apparent, however, that despite the hopes of all concerned, achieving the objectives of the Plan for health claimants would be very difficult, if not impossible. The principal problems were that the number of health claims, the rate at which they would be filed and their average liquidated value far exceeded estimates made when the Plan was approved. Other problems were the inefficiency of the first-in-first-out (FIFO) procedure. In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. at 759, and the grossly disproportionate amount of money flowing out of the Trust for expenses of attorneys. See Mark A. Peterson, Giving Away Money: Comparative Comments on Claims Resolutions Facilities, 53 L. & Contemp.Probs. 113, 129 (Autumn 1990). Far from paying in full all health claimants, present and future, over a fairly lengthy period of years, the Trust was effectively out of money to pay even its current and short term obligations. In September 1990, Judge Weinstein appointed Marvin E. Frankel as special master to examine and report on the financial condition of the Trust. The special master reported that the Trust was “deeply insol *753 vent.” He estimated the current and future claims to be at $6.5 billion and found that the Trust currently lacked the cash to pay the then-liquidated total of $448.5 million in claims.
It was thus obvious that something had to be done, and done quickly, to carry out the original salutary purposes of the Plan and the Trust for the health claimants. Spurred on by the efforts of Judge Weinstein, a negotiation then ensued among all the interested parties. This resulted in a revised Trust Distribution Process (TDP), which was accomplished by the filing of a class action against the Trust by five health claim beneficiaries as plaintiffs and a Stipulation of Settlement of that action. The Settlement was approved and incorporated into a judgment in June 1991.
The Settlement resulted in a restructuring of the payment mechanism (the Trust) originally put in place in 1986 when the Plan was confirmed. It was quite clear by June 1991 that the Plan’s provision that the Trust pay in full all health claimants over a period of years would be achieved, if at all, only with substantial changes in the operation of the Trust. The new TDP stated its objective to be “to treat all claimants alike by paying all claimants an equal percentage of their claims’ values over time.” As part of the overall changes in the TDP, the reorganized debtor agreed to pay the Trust at least $280 million and possibly an additional $240 million. The TDP divides all asbestos disease claims into two levels: the most seriously injured claimants are in Level One and the rest are in Level Two. Claimants in Level One receive payment in the first two years of the TDP and Level Two claimants begin to receive payment in the third year. Claimants in Level One will initially receive up to 45% of their claims and then stop receiving payment until all other claimants have received 45%. Thereafter, payments will be made on a pro rata basis to all, as funds are available.
The above recital omits many of the facts set forth in the majority opinion but should be enough to demonstrate the following:
1.Under the Plan and its payment mechanism (the Trust), health claimants, present and future, were to be paid in full over a period of years.
2. It became impossible to carry out this intent unless the payment mechanism received additional funds and the way it operated was changed to reduce costs and to spread out payments.
3. The Settlement, by providing for payment in equal percentages out of limited funds (with the hope of eventual payment in full), is a good-faith effort to carry out the intent of the Plan and Trust with regard to the health claimants.
II.
It is against this background that the rulings of the majority from which I dissent must be considered. I believe that those rulings are the product of three misconceptions. The first is that the use of Rule 23 to change the rights of creditors of an insolvent entity should be accepted only grudgingly, if at all. Prior authority in this court does not require such reluctance. See, e.g., In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir.), cert. filed, 61 U.S.L.W. 3151 (Aug. 13, 1992); In re Diamond Shamrock Chemicals, Co., 725 F.2d 858 (2d Cir.1984). Cf. In re American Reserve Corp., 840 F.2d 487, 488-93 (7th Cir.1988); Green v. Occidental, 541 F.2d 1335, 1340 n. 9 (9th Cir.1976). It is true that we stated in Drexel that “a mandatory class action will not be appropriate in most bankruptcy cases.” 960 F.2d at 292. But we nevertheless approved the use of Rule 23 in a bankruptcy context because of the exigencies noted there. The same justification applies here.
Moreover, there is at least doubt as to whether the bankruptcy laws alone can effectively deal with the problem of future claimants in the context of mass torts whose damage may not surface for many years. See Kane, 843 F.2d at 639; In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. at 839; In re Johns-Manville Corp., 68 B.R. at 628. See also Newberg on Class Actions §§ 20.-28, 20.31 (Cum.Supp., pt. one. Mar. 1992). The usefulness of Rule 23 in this situation *754 is thus apparent, particularly when the future asbestos-diseased claimants were “the raison d’etre" of the reorganization, and these claimants as a group stand to suffer the most if the Settlement fails. Certainly, as the majority recognizes, the Bankruptcy Rules themselves “make Rule 23 of the Civil Rules applicable to adversary proceedings.” At the very least, the use of Rule 23 in this context should not be scrutinized with undue wariness.
Second, in its discussion of the use of Rule 23, the majority appears to focus on the plaintiff beneficiaries’ class action against the Trust as though that action stood by itself, apart from the history set forth above. But that is not the case. The Trust is not simply any insolvent entity. Nor, as the majority notes, is the Trust “an ordinary private understanding of a settlor to carry out private preferences.” It is a payment mechanism created by a plan of reorganization. The efforts of the Trial Courts to restructure the Plan’s payment mechanism are not an attempt to subvert the bankruptcy laws; they are an attempt to carry out the purposes of a trust that itself was the product of a reorganization under those laws. Moreover, the restructuring of the Trust is entirely proper since the purpose of creating the Trust was to carry out the provision of the Plan that called for payment of health claims in full. It may be that unforeseen events have made that purpose difficult, and perhaps impossible, to achieve. We should nevertheless be slow to set aside the efforts of all those involved to achieve it, including those of the experienced trial judges who have lived with these massive proceedings on a daily basis.
Third, the majority appears to attribute unwarranted substantive importance to the Trust's FIFO procedure for the processing of beneficiaries’ health claims. In 1988, this court wrote: “Not all present asbestos claims must be paid immediately upon confirmation [of the Plan], and many will not be liquidated and presented for payment even within the first five years. More likely, payment of present health claims will be spread out over roughly a ten-year period.” Kane, 843 F.2d at 650. With the benefit of hindsight, we now know that this assumption as to when present health claimants would be paid was too optimistic; as it turned out, the Trust was “deeply insolvent,” in the words of the special master, only two years later. If you assumed, as this court did as late as 1988, that all present health claimants would be paid in full within ten years, then a FIFO preference simply meant you could get your money sooner. While this was not insignificant, it did not mean the difference between getting 100% compensation and zero. FIFO “rights” became that valuable only when people realized that the money would run out, not before. From this perspective, it is easy to see why the FIFO procedure had to be discarded: The most basic assumption upon which it rested, namely, full payment of all present health claimants over a period of years, had proved to be wrong.
The most that can reasonably be said for FIFO is that it seemed like an efficient procedure when the Trust Agreement, which makes frequent reference to the necessity for “efficient” resolution of claims, was drafted.[3] But what had seemed like *755 an efficient procedure proved to be otherwise. FIFO simply did not work. In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. at 759. In fact, FIFO and related procedures may have been the single most important factor leading to the insolvency of the Trust. To explain this requires considering the FIFO procedures in detail. Annex B provided that all claims be processed, from filing of claim forms to issuance of check, within 120 days of filing. See Annex B § II.B.[4] If the Trust did not process a claim within 120 days, a claimant had a right to go to trial and thereby jump the FIFO queue. See Annex B. §§ II.B.11(c), II.B.13. “Therefore, even claimants with late filing dates were able to receive early processing and payment by going to trial.” Mark A. Peterson, Giving Away Money, 53 L. & Contemp.Probs. 113, 119 (Autumn 1990). Many claims took more than 120 days to process; consequently, many claimants were permitted to sue the Trust. See Marianna S. Smith, Resolving Asbestos Claims: The Manville Personal Injury Trust, 53 L. & Contemp.Probs. 27, 34 (Autumn 1990). This defeated one of the express purposes of the Trust.
As evidenced by one of the articulated purposes of the Trust, the crafters of the Plan genuinely wanted the Trust to be a negotiation-based settlement organization. They wanted claimants to explore all avenues of negotiation and alternative dispute resolution before turning to litigation as a last resort. To meet this objective, the Plan established a “formula” for ordering the payment of claims, allowing the Trust to take cases docketed and scheduled for trial out of queue and settle them. This appeared to be a reasonable approach. However, two factors led to the Trust’s inundation with active litigation. The first factor was purely operational: the Plan permitted claimants to sue the Trust 120 days after filing their claims with the Trust. Because the Trust had received such an enormous volume of claims and was unable to make offers on all of them within 120 days, claimants had the right to sue and did so to improve their position in the queue.
The second factor influencing the volume of litigation was an acceleration in the volume of cases tried in the courts compared to the relative handful of asbestos cases that came to trial in the mid-1980’s.
Id. (citations omitted). The costs of defending the “inundation” of litigation ate up the Trust’s funds faster than anybody expected and made the compensation process unworkable. Peterson, Giving Money Away, 53 L. & Contemp.Probs. at 119-20.
Once the inadequacy of the Trust’s assets became apparent, the need to adjust the payment mechanism became paramount. The Trial Courts were faced with the prospect that many health claimants would get little or no compensation while others would receive 100%. But under the Plan, all present health claimants were to be paid in full. Kane, 843 F.2d at 649. Unlike FIFO, which was merely one procedural aspect of the payment mechanism, the right of all present health claimants to the full value of their claims was a substantive right they received under the Plan. Moreover, if present health claimants were in danger of not getting their due under the Plan, a fortiori, the goal of meeting future asbestos-related liability was not likely to be met.[5]
*756 It must be noted, in addition, that FIFO “rights” are conferred by Annex B to the Trust Agreement. Annex B is subject to the purpose clause of the Trust Agreement, which calls for “fair, adequate and equitable compensation to bona fide Beneficiaries, whether known or unknown, without overpaying or underpaying any claims,” with “fair and efficient resolution of claims to be preferred over all else.” In addition, Annex B has its own purpose clause. Among the stated purposes of the Claims Resolution Procedures set forth in Annex B is the “equitable” resolution of claims. Annex B’s purpose clause also states that “the [Claims Evaluation and Handling] System is to provide compensation based upon the claimant’s injury.” It does not state that compensation is to be “based upon” the order of filing. The Trust was not designed to vindicate FIFO rights; on the contrary, FIFO procedures were designed to further the purposes of the Trust.
III.
This analysis leads me to conclude that the Trial Courts’ approval of the treatment of the health claimants, present and future, in the restructured Trust was not improper under Rule 23 or the bankruptcy laws. Based upon its misconceptions, the majority subjects the Settlement to “careful scrutiny” and concludes that under Rule 23 the health claimants should have been subdivided into four subclasses in order to modify the Trust, and that the representatives of Level One and Level Two health claimants could not validly settle the class action on behalf of the health claimants. Respectfully, I disagree.
I have already discussed why I believe that FIFO rights did not require subdividing the health claimants into subclasses. Nor was such action required by the change in payment procedures to allow the most seriously ill health claimants (Level One) to obtain 45% payment on their claims before the remaining health claimants (Level Two) get 45%, with both sharing pro rata thereafter. This not only made compassionate good sense but also represented a good-faith effort to realize the Plan’s stated objective to pay all liquidated health claims in full, or, short of that, to pay equal percentages of all claims over time in accordance with the purposes for which the Trust was created. It is true that Level Two claimants have to wait longer and have a greater risk of non-payment in full. But all health claimants — even those who were present claimants when the Plan was confirmed — were faced with the same rapidly deteriorating financial situation, which the Settlement halted. The majority notes that the Trial Courts estimated that the Manville stock would have to reach a price of $24 to $25 per share before the Trust could raise enough money to pay Level Two claimants the same 45 percent share of awards paid to Level One claimants, and that in the period prior to the Settlement, Manville shares traded at only between $4 and $5 per share. It seems equally worth noting that Manville shares are now selling at approximately $9 a share with a 52-week high of $107s.[6]
On this record, and free of any undue wariness about the use of Rule 23 in this situation, I do not discern the extensive “adversity” in the group of health claimants that the majority does, or the inadequacy of representation. The Trial Courts found that the claims of the representatives were typical of those of remaining class members: *757 In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. at 820. In addition, the Trial Courts found that
*756 [T]he representative cases embody a cross-section of the claims filed against the Manville Trust nationwide. Their cases arise out of the same underlying course of conduct and are based on the same legal theories as those of the class generally____ The class members and their representatives possess an identity of interest and appear to lack any critical inimical interests for purposes of Rule 23 certification.
*757 [t]he class representatives include persons who would qualify as Level Two Claimants under the Settlement, and each of the class counsel has clients who suffer from injuries which similarly fall within the definition of a Level-Two asbestos-related disease____ These claimants’ interests have been vigorously prosecuted throughout the negotiation process and resulted in the Settlement before the courts.
Id. at 859 (citations omitted). With regard to the health claimants, I see no persuasive basis for reversing the Trial Courts on these issues, whether we regard their rulings as findings of fact, subject to the clearly erroneous standard, see 7A Wright & Miller, Federal Practice and Procedure § 1765 at 271 (2d ed. 1986) (“[w]hat constitutes adequate representation is a question of fact____”), or an exercise of discretion, see Malchman v. Davis, 761 F.2d 893, 899 (2d Cir.1985) (question of adequacy is committed to sound discretion of district court). With respect to the health claimants, the Settlement carried out the intentions of the Plan and the Trust, and the class representatives accepted it. We should abide by that.[7]
Finally, the majority states that there is a “substantial” question whether the “alteration of beneficiaries’ rights” under the Trust “had a sufficiently plausible basis” in New York trust law “to make the Settlement a reasonable compromise of the lawsuit.” The majority finds it unnecessary to answer that question because it concludes that “[a]t a minimum,” the Settlement required “the separately obtained consents of representatives who fairly and adequately speak for each of the significant subclasses,” which the majority had already ruled had not been obtained. As to the adequacy of representation of the health claimants, I disagree for reasons already given. Moreover, if it were crucial to determine whether New York law allowed the restructuring of the Trust, the sensible course would be to certify that issue to the New York Court’ of Appeals. That tribunal can speak more appropriately (and more authoritatively) than we on whether the restructuring permissibly serves the interests of the beneficiaries, so many of whom are undoubtedly New York residents.
Accordingly, I concur in part and dissent in part, as set forth above.

. See In re Johns-Manville Corp., 68 B.R. 618 (Bankr.S.D.N.Y.1986), aff’d in part, rev’d in part, 78 B.R. 407 (S.D.N.Y.1987), aff’d sub nom, Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir.1988). See also (in chronological order) In re Johns-Manville Corp., 801 F.2d 60 (2d Cir.1986); In re Johns-Manville Corp., 824 F.2d 176 (2d Cir.1987); MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89 (2d Cir.1988); In re Johns-Manville Corp., 920 F.2d 121 (2d Cir.1990).

. This appeal concerned the operation of a parallel trust created for payment of property damage claims.

. In responding to this point, the majority quotes from a joint brief filed in this appeal by the trustees and class action plaintiffs challenging the Trial Courts’ appointment of experts pursuant to Rule 706. See maj. op., at 743. There is nothing "ironic" about the position taken by the trustees and class action plaintiffs in that brief when the quoted passage is read in context. The gravamen of the argument from which the majority quotes is that the trustees breached no fiduciary duty in not maintaining adequate reserves for the future health claimants. In essence, the trustees’ argument is: “Don’t blame us for not maintaining adequate reserves for the future health claimants; blame FIFO. Our hands were tied by FIFO procedures which prevented us from maintaining adequate reserves.” The quoted brief, when read in full, simply underscores the necessity of doing away with FIFO if the purposes of the Trust to compensate all health claimants, present and future, are to be fulfilled. Moreover, the context makes clear that the “claimants who came afterward” to which the quoted language refers are future health claimants, not present health claimants who happen to have filed their claims after other present health claimants. Thus, the language quoted by the majority does not contradict my main point that the most basic assump *755 tion upon which the FIFO procedure rested was that present health claimants would be paid in full over a period of years.

. The following is a concise summary of the procedures set forth in Annex B § II.B. (1) The Trust must promptly review claim forms after filing and then contest exposure within 30 days or make a written goodfaith offer of settlement within 90 days; (2) After that initial 90-day period, the claimant has 10 days to respond; (3) If the claimant makes a counter-proposal, the Trust has 10 days to respond; otherwise the Trust must issue a check within 20 days.

. Abandoning FIFO was only one of the ways the Settlement sought to reduce transactional costs and enhance the fairness of distribution. Another change approved by the Settlement was a cap on attorneys’ fees payable in connection with liquidated claims, limiting them to the fee provided in the contract between claimant and counsel or 25%, whichever is less. The fee provision in the Settlement "compels all to *756 share in the necessary adjustments to account for the Trust’s limited resources." In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. at 869.

. See N.Y. Times, Dec. 1, 1992, at D10.

. I do agree with the majority that the co-defendant manufacturers and the health claimants have adverse interests that prevent their being represented by the same representative plaintiffs. Unlike the health claimants, whose cases "are based on the same legal theories” as those of the representative plaintiffs, the co-defendant manufacturers lack an "identity of interest” with the representative plaintiffs. See In re Joint Eastern & Southern Districts Asbestos Litigation, 129 B.R. at 820.