42 F.3d 747
 26 Bankr.Ct.Dec. 535, Bankr. L. Rep. P 76,306
 In re NEW YORK TRAP ROCK CORPORATION, Lone Star Industries,
Inc. et al., Debtors.
LONE STAR INDUSTRIES, INC., a Delaware corporation, Debtor
and Debtor-in-Possession, Plaintiff-Appellant,
v.
COMPANIA NAVIERA PEREZ COMPANC, S.A.C.F.I.M.F.A., SUDACIA,
S.A., Inversora Patagonica, S.A. and Loma Negra
Compania Industrial Argentina S.A., all
Argentine corporations,
Defendants-Appellees.
 No. 1579, Docket 93-5124.
 United States Court of Appeals,
Second Circuit.
 Argued May 12, 1994.
Decided Dec. 12, 1994.
 
 Steven M. Kayman, New York City (Samuel R. Hill, Proskauer Rose Goetz & Mendelsohn, New York City, on the brief), for plaintiff-appellant.
 C. William Phillips, New York City (J. Jay Lobell, Howard, Darby & Levin, on the brief), for defendants-appellees Compania Naviera Perez Companc, S.A.C.F.I.M.F.A., Sudacia, S.A. and Inversora Patagonica, S.A.
 Lynn P. Harrison III, New York City (Laishley P. Wragg, Jr. and Gary M. Feuerman, Curtis, Mallet-Prevost, Colt & Mosle, on the brief), for defendant-appellee Loma Negra Compania Industrial Argentina S.A.
 Before: NEWMAN, JACOBS, and LEVAL, Circuit Judges.
 LEVAL, Circuit Judge:
 
 
 1
 This is an appeal from an order of the United States District Court for the Southern District of New York, Vincent L. Broderick, Judge, 160 B.R. 876 affirming an order of the Bankruptcy Court for the Southern District of New York, Howard Schwartzberg, B.J., dismissing the Debtor's complaint in an adversary proceeding. 155 B.R. 871.
 
 
 2
 The bankruptcy court granted summary judgment to defendants Compania Naviera Perez Companc, Sudacia, S.A. and Loma Negra Compania Industrial Argentina, S.A. on the Debtor's claim that they engaged in collusive bidding for property of the Debtor in violation of 11 U.S.C. Sec. 363(n),[1] and dismissed the Debtor's claims of fraudulent concealment and tortious interference with contractual relations for failure to state a cause of action and lack of personal jurisdiction, respectively. The Debtor's only claim against defendant Inversora Patagonica, which alleged breach of by-laws, was dismissed for lack of personal jurisdiction.
 
 
 3
 We affirm in part, and reverse in part.
 
 Factual Background
 
 4
 Lone Star Industries, Inc. ("Lone Star" or the "Debtor") filed a petition for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. Secs. 1101 et seq. (1988). During the administration of the reorganization, as part of an effort to liquidate its interests in the South American cement market, Lone Star sought to sell its wholly-owned Argentine subsidiary, Compania Argentina de Cemento Portland, S.A. ("CACP"), which in turn owned a 50% interest in Cemento San Martin ("CSM"), an Argentine cement producer. Lone Star alleges that the financial condition of CACP was not significantly affected by any assets or liabilities other than its ownership of the half interest in CSM, so that ownership of CACP, for purposes of this action, is the substantial equivalent of ownership of the half interest in CSM.[2] CACP had acquired its interest in CSM through a joint venture with Compania Naviera Perez Companc, S.A.C.F.I.M.F.A. ("Perez") and Perez's wholly owned subsidiary Inversora Patagonica ("Patagonica"), whereby CACP and Perez-Patagonica each acquired one-half of the stock of CSM.
 
 
 5
 The following diagram illustrates the relationship among these entities:NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 6
 CSM's by-laws provide each joint-venturer--CACP and Patagonica--with a right of first refusal in the event the other joint-venturer sells its 50% interest to a third party.
 
 
 7
 In 1992, under supervision of the bankruptcy court, Lone Star began marketing efforts directed toward the sale of CACP. It offered its CACP stock (and thus, its 50% share of CSM) for $55 million to numerous cement producers, six of whom showed an interest. Of these six, Perez (acting jointly with its affiliate Sudacia), was the only party to submit a bid; Perez offered to purchase CACP for $36 million. On May 9, 1992, Lone Star and Perez entered into a stock purchase agreement (the "Agreement"), which provided that Perez would pay $36 million in cash for CACP.
 
 
 8
 Pursuant to this contract, three conditions had to be met before the sale to Perez could go forward: First, that Perez be a "good faith purchaser"; second, that the bankruptcy court approve the transaction; third, that no other entity outbid Perez by at least $1 million.
 
 
 9
 On May 14, 1992, Lone Star sought, and on June 4, the bankruptcy court approved, an order governing overbid procedures. The order required each bidder, inter alia, to submit a written bid at least three days prior to the sale, overbid the current highest bidder by at least $1 million, and prove financial capability. The procedures did not include any requirement that a bidder disclose any relationships among potential bidders. The bankruptcy court scheduled a hearing to approve the sale for August 12, 1992. Notice of the sale, subject to better offers, was published in The New York Times, The Wall Street Journal and El Cronista Commercial.
 
 
 10
 In July, two additional bidders entered the scene. Petroquimica Comodoro Rivadavia, S.A. ("Petroquimica"), one of the six companies which had earlier shown interest in CACP, submitted a bid of $37 million on July 15, contingent upon financing and completion of due diligence. On July 24, Loma Negra Compania Industrial Argentina S.A. ("Loma Negra") submitted an unconditional bid for $38 million in cash.
 
 
 11
 On August 6, 1993, while its $38 million bid was on the table, without disclosure to Lone Star or the bankruptcy court, Loma Negra signed an agreement to purchase Perez-Patagonica's 50% interest in CSM for $55 million.
 
 
 12
 On August 11, Petroquimica withdrew from the bidding, leaving only Perez and Loma Negra as bidders. On August 12, the court held a hearing to conclude the sale. Perez neither appeared nor submitted an additional bid. The court thus authorized the sale of CACP to Loma Negra for $38 million.
 
 
 13
 CSM's by-laws required Patagonica to notify CACP of any planned sale of CSM and to provide it the right of first refusal. Neither Perez, nor Patagonica, nor Loma Negra informed Lone Star, CACP, or the court that Loma Negra had purchased Perez's 50% share of CSM. Perez's sale to Loma Negra was not disclosed until after the conclusion of the bankruptcy sale at which Loma Negra purchased CACP from Lone Star.
 
 1. The Adversary Proceeding
 
 14
 Several months after the sale, Lone Star commenced an adversary proceeding in the bankruptcy court against Perez, Patagonica, Sudacia, and Loma Negra. Lone Star's complaint alleged that Perez, Sudacia, and Loma Negra (1) violated 11 U.S.C. Sec. 363(n) by entering into a secret agreement to control the price of the bankruptcy sale of the CACP stock, (2) fraudulently concealed Loma Negra's purchase and Perez's sale of Perez's interest in CSM, and (3) tortiously interfered with and induced Patagonica's breach of CSM's by-laws; and that Patagonica breached the CSM by-laws by failing to advise Lone Star of its sale, and offer first refusal.
 
 
 15
 Defendants moved to dismiss the adversary complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6), lack of jurisdiction, and failure to plead fraud with particularity under Fed.R.Civ.P. 9(b). Lone Star cross-moved for partial summary judgment, arguing that Perez's agreement to sell its CSM interest to Loma Negra had the effect of controlling the sale price of CACP, and therefore violated Sec. 363(n) as a matter of law.
 
 2. The Bankruptcy Court Decision
 
 16
 The bankruptcy court stayed discovery pending resolution of these dispositive motions. The court denied Lone Star's motion for partial summary judgment; although Perez and Loma Negra had not moved for summary judgment, the court sua sponte granted them summary judgment dismissing Lone Star's claim under Sec. 363(n). The court reasoned that Sec. 363(n) was intended to remedy situations where potential bidders colluded to fix the sale price of the debtor's property, not where bidders colluded with respect to non-debtor property. Moreover, the bankruptcy court found no precedent for Sec. 363(n) liability where the price of the debtor's property is merely affected, and not controlled, by an agreement concerning non-debtor property.
 
 
 17
 The bankruptcy court also granted the defendants' motions to dismiss Lone Star's common law claims. As to the claim of fraudulent concealment, the court held that Lone Star's failure to demand disclosure of relationships among bidders as a condition of the overbid procedures barred it from complaining of Loma Negra's failure to disclose its purchase from Perez. As to the claim against Patagonica for breach of CSM's by-laws and against Perez and Loma for inducing Patagonica's breach, the court held the defendants were not subject to the court's jurisdiction.
 
 3. The District Court Decision
 
 18
 On appeal, the district court affirmed the dismissal of the adversary complaint. In the district court's view, Lone Star's claim under Sec. 363(n) merely protested its lack of bargaining power vis-a-vis Perez during the sales of their respective halves of CSM. Perez could obtain a better price for its one-half share of CSM, because Perez was able to sell in circumstances that guaranteed to Loma Negra 100% control of CSM, while Lone Star, under compulsion to sell to the highest bidder, could not. That Lone Star did not receive a control premium does not entitle it to seek recovery under Sec. 363(n), because Lone Star failed to demonstrate that Perez and Loma Negra colluded to control the price received by Lone Star on the bankruptcy sale.
 
 
 19
 The district court also affirmed the dismissal of Lone Star's common law claims. In addition to adopting the bankruptcy court's reasoning, the district court found that there was no supplemental jurisdiction over the common law claims under 28 U.S.C. Sec. 1367(c), and in the alternative, that the claims should be dismissed on grounds of forum non conveniens.
 
 Discussion
 I. Section 363(n)
 
 20
 1. Lone Star's motion for summary judgment. Lone Star contends the bankruptcy court should have granted its motion for summary judgment. It argues: By purchasing Perez's[3] interest in CSM, Loma Negra effectively eliminated Perez's incentive to bid for Lone Star's half of CSM, with the result that Loma Negra encountered no bidding opposition; Lone Star's interest was then sold for less than would have been realized had Loma Negra and Perez been competitors; focussing on the undisputed fact that Perez made a contract with Loma Negra to sell its interest in CSM while the bankruptcy sale of Lone Star's interest in CSM was pending, Lone Star contends the Perez-Loma Negra agreement affected the price of Lone Star's subsequent sale.
 
 
 21
 Lone Star contends that Sec. 363(n) prohibits agreements among potential bidders that affect the price realized at a bankruptcy sale. We do not agree.
 
 Section 363(n) provides:
 
 22
 The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale....[4]
 
 
 23
 It thus covers agreements among potential bidders that "control [ ]" the sale price. An agreement to "control" the sale price is very different from an agreement that "affects" the sale price.
 
 
 24
 To "control" a price is to "exercise restraining or directing influence over" it; to "regulate" or "curb," "dominate," or "rule" it. Webster's Third New International Dictionary, 496 (G. & C. Merriam Co. 1976 ed.). In such context the term "control" implies more than acts causing an incidental or unintended impact on the price; it implies an intention or objective to influence the price. This interpretation also finds support in the legislative history. Congress explained that Sec. 363(n) is "directed at collusive bidding on property," (emphasis added) H.R.Rep. No. 595, 95th Cong., 1st Sess., at 346 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6302. "Collusion" is defined as "secret cooperation for a fraudulent or deceitful purpose." Webster's Third New International Dictionary 446 (G. & C. Merriam Co. 1976 ed.).
 
 
 25
 The use of the term "collusive" indicates that Congress intended in Section 363(n) to prohibit only agreements that are intended to control a sale price, and not all agreements having the unintended consequence of influencing a sale price--i.e., not all agreements that affect a sale price.
 
 
 26
 It is most unlikely Congress would have intended to prohibit all agreements that affect a sale price. Such a prohibition would cover a vast range of innocent agreements among potential bidders; it would furthermore be very difficult for the parties to an agreement to recognize that their agreement was unlawful. They would need to make an imaginative exploration of the potential consequences of their agreement to determine whether it had a potential to affect the price of the auction sale.
 
 
 27
 We therefore reject Lone Star's contention that it was entitled to summary judgment because Perez's sale of its interest in CSM to Loma Negra affected the sale price of Lone Star's bankruptcy sale of the other half interest in CSM. We hold that the prohibition by Sec. 363(n) of agreements among potential bidders that control the sale price does not implicate agreements that merely "affect" the sale price. The influence on the sale price must be an intended objective of the agreement, and not merely an unintended consequence, for the agreement among potential bidders to come within the prohibition of Sec. 363(n). See, e.g., Ramsay v. Vogel, 970 F.2d 471 (8th Cir.1992). The district court correctly denied Lone Star's motion for summary judgment.
 
 
 28
 2. The grant of summary judgment to Perez and Loma Negra.
 
 
 29
 On the basis of the theory explained in the preceding section, the bankruptcy court dismissed the complaint and granted summary judgment to Perez and Loma Negra dismissing the complaint. It concluded that, because Lone Star had shown only an agreement that affected the sale price of Lone Star's interest in CACP, and not a collusive agreement intended to control that price, Lone Star could not make out a violation of Sec. 363(n). We conclude that this ruling was error, for it failed to give Lone Star credit for the full scope of its allegations.
 
 
 30
 The Debtor's complaint does not merely allege that the transaction between Loma Negra and Perez had the unintended effect of depressing the value of the Debtor's interest in CSM. The complaint asserts that Perez "had secretly entered into an agreement with [Loma Negra] pursuant to which Perez had agreed to sell its 50% interest in CSM to Loma Negra for $55 million dollars and drop out of the bidding "; it further alleges that Loma Negra and Perez entered into the agreement to "control the price of the CACP stock at the August 12 hearing." Under Lone Star's stated theory, Loma Negra paid $55 million not only to acquire Perez's half interest in CSM, but also to induce Perez to drop out of the bidding for Lone Star's share so that, notwithstanding its higher value, it could be sold to Loma Negra at a low price, with Perez and Loma Negra sharing the difference. This states a viable claim under Sec. 363(n). See Ramsay v. Vogel, 970 F.2d 471.[5]
 
 
 31
 To the extent that the complaint alleges that part of the $55 million payment was to induce Perez to drop out of the bidding, this comes close to the classic collusive bidding against which the statute is directed. The hypothesis of the complaint is: Perez and Loma Negra each recognized that Lone Star's half of CSM had a value in excess of $38 million and would fetch a higher price if both of them bid competitively, permitting Lone Star to realize full value; Perez and Loma Negra agreed it was preferable that they should share the value of Lone Star's CSM stock to the extent it exceeded $38 million; they therefore agreed that Perez would drop out, leaving Loma's $38 million bid unsurpassed, and that they would adjust between them to share the profit that, but for their collusion, would have gone to Lone Star. Loma Negra's payment of $55 million to Perez for the other half of CSM included a division between them of the profit resulting from Loma Negra's unopposed bargain purchase of Lone Star's half of CSM. To the extent Lone Star's complaint alleges that it was a term of the Loma Negra-Perez agreement (whether written or unwritten) that Perez would drop out of the bidding for Lone Star's half of CSM, the complaint alleges a prohibited voidable transaction under Sec. 363(n).
 
 
 32
 The bankruptcy court should not have granted summary judgment to the defendants on this claim. Lone Star had pleaded a viable theory. If Lone Star was chargeable with failure to show evidence that could support the theory, it was surely entitled to discovery before being required to do so. Nor was Lone Star precluded by the absence of such a term from the written agreement between Perez and Loma Negra. Discovery might show either that such a term was contained in a separate written side agreement, or that it was a part of the agreement between Perez and Loma Negra which, for obvious reasons, was not committed to writing. In such a case, Lone Star would have proved its cause of action.
 
 
 33
 We recognize that Perez may have dropped out of the bidding for other, innocent reasons. Having sold its half-interest in CSM (and therefore having given up the opportunity to acquire control by purchase of Lone Star's half), Perez might reasonably have lost all interest in acquiring the Lone Star half. It could also be the case that Perez made its initial bid of $36 million without enthusiasm for increasing its investment in CSM, but wishing to protect itself (at reasonable cost) from an involuntary marriage with an unwanted partner. There are many possible lawful reasons why Perez might have dropped out of the bidding. The defendants will be entitled to summary judgment unless after discovery Lone Star can show "that there is a genuine issue for trial" as to whether Perez and Loma Negra had an agreement that Perez would drop out after selling its half to Loma Negra. Fed.R.Civ.P. Rule 56(e).
 
 II. Fraudulent Concealment
 
 34
 The bankruptcy court dismissed Lone Star's claim of fraudulent concealment on the ground that neither the "special facts doctrine" nor the Patagonica-CACP joint venture agreement imposed a duty of disclosure on Perez or Loma Negra. It found that Lone Star's failure to demand notification of relationships among bidders, as a part of the overbid conditions, precludes it from complaining of the failure of Loma Negra and Perez to advise of their contract for the sale of Perez's half of CSM.
 
 
 35
 In our view, the bankruptcy court again failed to focus on a significant aspect of Lone Star's claim. If Lone Star were complaining of the failure to advise it only of the sale of Perez's interest, the bankruptcy court's analysis might well be correct. But Lone Star complains also of the failure to advise it of the alleged illegal term of the Perez-Loma Negra agreement--that is, Loma Negra's payment to have Perez drop out of the bidding for Lone Star's half of CSM. As to this alleged agreement, we find that fraudulent concealment was properly pleaded.
 
 
 36
 A claim for fraudulent concealment must allege (1) nondisclosure of (2) material facts, in the face of (3) a duty to disclose, (4) scienter, (5) reliance, and (6) damages. See Brass v. Am. Film Technologies, Inc., 987 F.2d 142, 152 (2d Cir.1993). Lone Star's allegations include all these elements. As to the duty to disclose, this court's decision in In re Beck Indus., Inc., 605 F.2d 624 (2d Cir.1979) (Friendly, J.) is instructive. In Beck, Ross, an officer of the debtor, who had a right of first refusal to purchase some of the debtor's properties, entered into a secret joint venture with a prospective bidder (Butler) to bid, in part on Butler's behalf, while concealing Butler's interest from the opposing bidder Edison. The court concluded that because Butler and Edison were competitors and each had an interest in keeping the assets out of the other's hands, Ross's concealment of Butler's bid resulted in Edison's permitting the assets to be sold to Ross, in part for Butler, at a price below what Edison would have paid to keep the assets out of Butler's hands. A higher bid by Edison would have taken the price beyond Ross's ability to pay. The concealment, for Ross's benefit, deprived the debtor of the opportunity to maximize the price it realized upon the sale. In disallowing the sale to Ross, the court, having emphasized that "a bankruptcy court sits as a court of equity," 605 F.2d at 634, asserted that the concealment by Ross and Butler of their secret agreement, intended to blindside the other interested parties and the court, was unlawful and required that the sale be disallowed.
 
 
 37
 Although there are differences between our circumstances and those found in Beck, the similarities are more persuasive. It is true that Ross was a fiduciary of the debtor, while Perez and Loma Negra were not. But the Beck decision did not turn on Ross's fiduciary status. Indeed, the court expressly stated that bankruptcy courts "do not tolerate such [concealment] even from those who are not fiduciaries, much less from one who is." 605 F.2d at 636 (citation omitted).
 
 
 38
 In this case (according to Lone Star's allegations), as in Beck, Perez and Loma Negra concealed a secret joint venture which was designed to deprive the selling debtor of full market value and to divide the benefit of the resulting bargain purchase between the joint venturers. Such secret collusion designed to deprive the debtor of a fair price on the sale of its assets is at least as reprehensible as that in Beck--in some ways more so. For the court acknowledged in Beck that, in general, "an association of persons formed for the purpose of bidding [is] ... unobjectionable," 605 F.2d at 635 (quotation omitted), and that "ordinarily an agent may bid at a judicial sale on behalf of an undisclosed principal." 605 F.2d at 636. Here, in contrast, the conduct alleged against the defendants is illegal, as explained above, under Sec. 363(n). We have no difficulty concluding that there is a duty to disclose such an illegal collusive arrangement.
 
 
 39
 As to the element of reliance, Lone Star's ignorance of the alleged collusive agreement to eliminate competitive bidding prevented it from seeking relief in various forms in the bankruptcy court and/or in other courts, including an injunction to bar the illegal transaction, or the relief it seeks in this action--an award of damages to compensate it for its failure to realize full value on the sale.
 
 
 40
 Regardless whether the bankruptcy court was correct that Lone Star's failure to require disclosure of relationships among bidders bars it from complaining of the failure to disclose Loma Negra's purchase from Perez, it does not bar Lone Star from complaining of the failure to disclose an illegal collusion designed to hold down the bidding and share the profits derived therefrom.
 
 III. Breach of CSM's By-Laws
 
 41
 The bankruptcy court dismissed Lone Star's claims against Patagonica for breach of its obligation under CSM's by-laws to give Lone Star notice and first refusal upon Patagonica's sale of its CSM interest to Loma Negra, and against Perez and Loma Negra for having induced Patagonica to so breach. The court found that these claims were beyond the territorial jurisdiction of the courts of New York. Lone Star contends this was error because the failure to give notice was an instrumental step in achieving the secret illegal collusion at Lone Star's bankruptcy sale in New York.
 
 
 42
 As the bankruptcy court failed to give Lone Star credit for the full measure of its allegations of illegal collusion, it failed also to consider these claims in relation to the alleged illegal collusion. We therefore remand the breach of contract and inducement claims for reconsideration without deciding whether these claims do, or do not, allege a cause of action within the jurisdiction of the bankruptcy court, or whether principles of ancillary jurisdiction permit their consideration.
 
 Conclusion
 
 43
 The dismissal of Lone Star's claims of illegal collusion under Sec. 363(n) and fraudulent concealment is reversed. The dismissal of the claims of breach of contract and inducement to breach is vacated and the claims are remanded for further consideration. The denial of summary judgment in favor of Lone Star is affirmed. Remanded for further proceedings.
 
 
 
 [1]
 The District Court alternatively dismissed the Sec. 363(n) claim for failure to state a cause of action
 
 
 [2]
 CACP also owns 96.7% of the stock of Canteras de Riachuelo, S.A. Lone Star asserts that this asset's value is less than 3% of the value of CACP's CSM stock
 
 
 [3]
 Throughout this opinion, for simplicity, references to Perez and Lone Star sometimes implicate the actions of their wholly owned subsidiaries Patagonica and CACP. References to Perez also include its affiliate Sudacia
 
 
 [4]
 The full text is as follows:
 The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such agreement in willful disregard of this subsection.
 
 
 [5]
 In Ramsay, the Eighth Circuit found that the trustee had made out a valid claim under Sec. 363(n). The complaint alleged that two bidders, Vogel and Downing, submitted offers to purchase property of the debtor: Vogel bid $1.2 million, Downing $1.225 million. The two bidders then entered into an agreement pursuant to which Downing would drop out of the bidding in return for an option to purchase the property from Vogel after Vogel consummated the purchase from the debtor for $1.2 million. If Downing exercised the option, he would pay Vogel $1.55 million in return for the asset. If Downing did not, Vogel would pay Downing $350 thousand. Thus, the estate only received $1.2 million, even though the bidders apparently valued the asset at $1.55 million