111 F.3d 269
 30 Bankr.Ct.Dec. 832, Bankr. L. Rep. P 77,383
 In re COLONY HILL ASSOCIATES, New York Limited Partnership,
and Blydenburgh Properties, Inc., Debtors.
KABRO ASSOCIATES OF WEST ISLIP, LLC, Plaintiff-Appellant,
v.
COLONY HILL ASSOCIATES, a New York Limited Partnership, and
Blydenburgh Properties, Inc., Debtors-Appellees,
The Greater New York Savings Bank and Republic National
Bank, Creditor-Appellees,
and
The Holiday Organization, Inc., Appellee.
 No. 1294, Docket 96-5117.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 6, 1997.
Decided April 9, 1997.
 
 Ronald J. Rosenberg, Garden City, NY (William J. Birney, Lesley A. Reardon, of counsel), for Plaintiff-Appellant.
 Jeffrey N. Rich, New York City (Winick & Rich, P.C., Jeffrey H. Weinberger, of counsel), for Debtors-Appellees.
 Weil, Gotshal & Manges, New York City (Stephen Karotkin, of counsel), for Creditor-Appellee Greater New York Savings Bank; Cadwalader, Wickersham & Taft, New York City (Barry J. Dichter, Susan F. Dicicco, of counsel), for Creditor-Appellee Republic National Bank of New York; Certilman, Balin, Adler & Hyman, LLP, East Meadow, NY (Michael D. Brofman, Jaspreet S. Mayall, of counsel), for Appellee The Holiday Organization, Inc.
 Before NEWMAN, Chief Judge, FEINBERG and McLAUGHLIN, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 In an order dated July 29, 1996, the United States Bankruptcy Court for the Eastern District of New York, Robert J. Hall, Bankruptcy Judge, confirmed a sale to The Holiday Organization, Inc. (Holiday) of certain property of debtor Colony Hill Associates (Colony). Appellant Kabro Associates of West Islip, LLC (Kabro), a New York corporation engaged in real estate development in the tri-state area, appealed from this order to the United States District Court for the Eastern District of New York, Joanna Seybert, J. In a judgment entered September 23, 1996, Judge Seybert (1) denied Kabro's motion to stay the sale to Holiday pending appeal from the bankruptcy court's confirmation order, and (2) dismissed such appeal. Kabro now appeals from that judgment. For reasons set forth below, we affirm.
 
 I. Facts and Prior Proceedings
 
 2
 Colony, a New York limited partnership, operated as a Chapter 11 debtor-in-possession under the Bankruptcy Code from February 1991 through July 25, 1996, when its Plan of Reorganization (the Plan) was confirmed. During that period, Colony's primary assets included, among other things, the Marriot WindWatch Golf Course and some residential property (collectively the Property), both located near Colony's Marriot WindWatch Hotel, in Hauppauge, New York.
 
 
 3
 In June 1996, after five years of protracted proceedings, the bankruptcy court entered an order (the Notice) approving notice and bidding procedures with respect to sale of the Property. The Notice indicated that Colony had executed a contract to sell the Property to Gale & Wentworth, Inc. and Praedium Recovery Fund, L.P. (collectively G&W) for $7.5 million, "subject to higher and better offers" to be presented at a sale hearing on July 25. All bidders were required to submit initial bids to Colony in writing by 5:00 P.M. on or before July 15. An initial bid would be deemed "qualified" only if (1) it was irrevocable, not subject to any conditions and accompanied by a certified check for at least 15%, and (2) the bidder offered at least $8.15 million, demonstrated financial capability to complete the transaction and had a favorable reputation in the industry for undertaking similar projects. The bankruptcy judge required Colony to (1) mail the Notice to "the holders of claims and interests and all parties who have requested notices in this case or who may otherwise be entitled to notice pursuant to Federal Rule of Bankruptcy Procedure 2002" on or before June 28, and (2) publish the Notice at least once in the New York Times on or before July 10. Under the Plan, only secured creditors--the Greater New York Savings Bank (Greater NY) and Republic National Bank (Republic)--would benefit from an increase in the price at which the Property was sold.
 
 
 4
 As of the July 15 initial bid deadline, Colony had received only one qualified bid--from Holiday for $8.1 million.[1] However, on July 24, appellant Kabro filed an "emergency request" in the bankruptcy court for permission to submit a bid of $10 million at the sale hearing the next day, even though it had admittedly not submitted a timely initial bid. As justification for its noncompliance, Kabro claimed that notice of the sale had been insufficient, explaining that it had learned of the sale--but not of the initial bid requirement--only from a Newsday article dated June 14, 1996. Thereafter, instead of making a written inquiry regarding the sale, Kabro allegedly left phone messages for Colony expressing its desire to submit a bid. However, one of Colony's general partners and its counsel stated on the record in the bankruptcy court that they received no such messages. Kabro also asserted that it discussed with Republic and G&W its interest in purchasing the Property. Although these discussions allegedly took place before the July 15 deadline for initial bids, Kabro nevertheless maintains that it was not informed of this deadline until a meeting with G&W on July 17.
 
 
 5
 At the sale hearing on July 25, the bankruptcy court heard argument regarding whether it should allow Kabro to bid on the Property. Holiday opposed Kabro's motion, arguing that Kabro was not qualified to bid because it had not submitted an initial bid. The two secured creditors and G&W, on the other hand, initially stated either that they were amenable, upon certain conditions, to Kabro's participation in the auction, or that they favored a brief adjournment to further evaluate Kabro's bid. However, after Holiday increased its bid to $9.6 million and agreed to close on the purchase notwithstanding an appeal by Kabro, Republic opposed Kabro's participation in the bidding.
 
 
 6
 The bankruptcy court refused to adjourn the hearing and denied Kabro's motion to submit a bid, finding that notice of the sale had been adequate and that Kabro should not be excused for failing to submit an initial bid by July 15. The court designated Holiday the successful bidder, stating in an order dated July 25, 1996, that Holiday had made the "highest and best offer." The bankruptcy court also denied Kabro's motion for a stay of the sale pending appeal.
 
 
 7
 On appeal to the district court, Kabro argued that notice of the sale was inadequate and that the bankruptcy court (1) erred in refusing to allow Kabro to bid, and (2) abused its discretion by refusing to adjourn the hearing briefly to enable Colony and the creditors to properly evaluate Kabro's bid. Kabro also moved in the district court to stay the sale of the Property during the appeal. At a hearing in August 1996, Judge Seybert denied Kabro's motion for a stay and dismissed Kabro's appeal. Her oral rulings were incorporated into a judgment entered September 23.
 
 
 8
 On September 25, Kabro filed a notice of appeal and moved in this court for a stay of the sale pending appeal. That same day, the Clerk's Office granted Kabro an interim stay pending disposition of its motion. However, on October 8, 1996, during oral argument of Kabro's motion, Holiday informed a panel of this court that less than an hour before issuance of the interim stay, Holiday had closed on the sale of the Property. In an order dated October 8, that panel denied Kabro's motion for a stay. Thereafter, on Kabro's motion, we expedited the appeal.
 
 II. Scope of Review and Standing
 A.
 
 9
 Kabro asks us to set aside approval of the sale to Holiday, arguing that (1) by refusing to allow Kabro to bid, when faced with a bid by Holiday that was "grossly disproportionate" to the value of the Property, the bankruptcy court breached its duty to obtain the highest and best offer, (2) the bankruptcy court erred by refusing to adjourn the sale hearing to enable Colony and the secured creditors to fully examine Kabro's bid, (3) notice of the sale was inadequate, (4) the sale resulted from collusive bidding between Holiday and the creditors, and (5) Holiday was not a good faith purchaser. Holiday counters that Kabro's appeal is moot under 11 U.S.C. § 363(m) because Kabro failed to obtain a stay of the sale.
 
 
 10
 Section 363(m) provides, in relevant part, that:
 
 
 11
 The reversal or modification on appeal of an authorization ... of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.
 
 
 12
 Id. (emphasis added). We recently explained that this language "preclud[es] this Court from reviewing ... issues, other than the good faith of the purchaser, if the sale has closed ..." before the appeal is heard, even when an "appellant's challenge might raise [other] meritorious arguments." Licensing by Paolo, Inc. v. Sinatra (In re Paolo Gucci), 105 F.3d 837, 840 (2d Cir.1997). Limiting appellate jurisdiction in this manner "furthers the policy of finality in bankruptcy sales ... and assists the bankruptcy court to secure the best price for the debtor's assets." Id. (citing United States v. Salerno, 932 F.2d 117, 123 (2d Cir.1991)).
 
 
 13
 As noted above, on October 8, 1996, a panel of this court denied Kabro's motion for a stay, presumably based on affidavits submitted by Holiday showing that it had closed on its purchase of the Property shortly before the Clerk's Office entered its interim stay on September 25. Although Kabro suggests that the panel failed to take into account "defects" in that closing, we find no occasion to reconsider our prior panel's ruling. Because Kabro failed to obtain a stay before Holiday closed, all of Kabro's arguments are moot except its claim that Holiday was not a good faith purchaser under § 363(m).
 
 B.
 
 14
 Holiday also argues that Kabro lacks standing to challenge the bankruptcy court's approval of the sale. According to Holiday, Kabro is merely a "disqualified" or "unsuccessful" bidder with "no legally protectable interest at stake" in this case. In denying Kabro a stay and dismissing its appeal from the bankruptcy court, the district court found that Kabro was a "disqualified bidder, and as a disqualified bidder with a very remote and speculative possibility for future profits, it is unlikely that Kabro has standing to appeal."
 
 
 15
 A district court's order in a bankruptcy case is subject to "plenary" review, which "allows us to undertake an independent examination of the factual findings and legal conclusions of the bankruptcy court." Consumer News and Business Channel Partnership v. Financial News Network Inc. (In re Financial News Network Inc.), 980 F.2d 165, 169 (2d Cir.1992); Gulf States Exploration Co. v. Manville Forest Products Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384, 1388 (2d Cir.1990). We thus review a bankruptcy court's conclusions of law de novo and its findings of fact for clear error. Id.
 
 
 16
 Because the Bankruptcy Code does not expressly define appellate standing, courts have consistently applied a standard "derived from former section 39(c) of the Bankruptcy Act of 1898, which permitted only a 'person aggrieved' to appeal an order of the bankruptcy court." Kane v. Johns-Manville Corp., 843 F.2d 636, 641-42 (2d Cir.1988); Cosmopolitan Aviation Corp. v. New York State Dep't of Transp. (In re Cosmopolitan Aviation Corp.), 763 F.2d 507, 513 (2d Cir.1985). We have held that an "aggrieved person" is one who is " 'directly and adversely affected pecuniarily' " by the challenged ruling of the bankruptcy court. Kane, 843 F.2d at 641. This standard "reflect[s] the understandable concern that if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order." Id. at 642. Holiday correctly points out that under this standard, an unsuccessful bidder--whose only pecuniary loss is the speculative profit it might have made had it succeeded in purchasing property at an auction--usually lacks standing to challenge a bankruptcy court's approval of a sale transaction. See Lawrence P. King, Collier on Bankruptcy p 5.06 (15th ed. rev.1996).
 
 
 17
 In response, Kabro first attempts to distinguish between an unsuccessful bidder and a "disqualified bidder," one whose bid was not even considered by the bankruptcy court, and argues that the latter has standing to challenge its exclusion from the sale process. See Cedar Island Builders, Inc. v. South County Sand & Gravel, 151 B.R. 298, 300-02 (D.R.I.1993) ("potential" bidder had standing to challenge sale when defendant failed to publish notice of the sale); cf. In re Financial News Network Inc., 126 B.R. 152, 155 (S.D.N.Y.1991) (Lasker, J.) (suggesting that a disqualified bidder "appear[ed] to have alleged a sufficient basis" for standing), appeal dismissed on other grounds, 931 F.2d 217 (2d Cir.1991). However, Cedar Island differs from this case because there the debtor failed to give notice by publication of the sale as required by that court's local rules, thus depriving all potential bidders of their "right" to bid on the property. Cedar Island, 151 B.R. at 301. In contrast, the bankruptcy court refused to allow Kabro to bid based on its own failure to comply with the court-approved bidding procedures.
 
 
 18
 Nevertheless, the rule denying standing to unsuccessful bidders is not absolute. Relying heavily on a pre-Bankruptcy Code case in the Seventh Circuit, Kabro argues that even an unsuccessful bidder has standing to challenge the inherent fairness of a bankruptcy proceeding:
 
 
 19
 Courts ... properly entertain suits challenging the equity of a bankruptcy sale transaction, on the assumption that sales tinged by fraud, mistake or unfairness would generally result in an accepted bid below that which might have been expected in a fair, free market situation. Thus, when an unsuccessful bidder attacks a bankruptcy sale on equitable grounds related to the intrinsic structure of the sale, he brings himself within the zone of interests which the Bankruptcy Act seeks to protect and to regulate.
 
 
 20
 In re Harwald Co., 497 F.2d 443, 444-45 (7th Cir.1974) (internal citations omitted). As that court explained, the Bankruptcy Act was based on an implicit assumption that sale by public auction with competitive bidding will best maximize creditors' recoupment of debts owed. Id. at 444. However, the court dismissed the appeal because the Act did not give the bankruptcy court jurisdiction to adjudicate the unsuccessful bidder's claim that the sale violated federal antitrust laws. Id. at 445.
 
 
 21
 In another pre-Code case, In re Beck Industries, Inc., 605 F.2d 624 (2d Cir.1979), Judge Friendly cited Harwald with approval for the proposition that an unsuccessful bidder, Edison, had standing to appeal the district court's refusal to disqualify the successful bidder and direct confirmation of the sale to Edison. Id. at 634 n. 13. Edison claimed that the successful bidder and another bidder had entered a collusive agreement that "chilled" bidding. Id. at 637. Judge Friendly reasoned that Edison had standing based on its challenge to the " 'intrinsic structure of the sale.' " Id. at 634 n. 13 (citing Harwald, 497 F.2d at 444-45). Other courts have similarly used this rationale to determine standing. E.g., Zaccaro v. Bowery Savings Bank (In re Jewel Terrace Corp.), 10 B.R. 1008, 1012 (E.D.N.Y.1981) (unsuccessful bidder is "aggrieved" if "the sale was either fraudulent or unfair" and property was sold for improperly low price); In re REA Holding Corp., 447 F.Supp. 167, 169 (S.D.N.Y.1978) (appellate standing for unsuccessful bidder requires "some evidence of fraud, deceit, mistake of fact or other inequitable overreaching"); McDonnell v. Hotin (In re Hotin), 63 B.R. 226, 227 (D.Mass.1986) (same). Indeed, determination of whether an unsuccessful bidder has appellate standing and the merits of that bidder's claim "merge," in that "disposition of both ... require[s] review of the Bankruptcy Court's hearing and decision on the propriety of the sale." In re Hotin, 63 B.R. at 227 n. 2.
 
 
 22
 Applying the reasoning of these cases, it seems proper to consider Kabro's claim that Holiday was not a good faith purchaser. First, this is not a situation in which a party wholly unknown to the debtor and creditors appears after the sale hearing and seeks to challenge a consummated sale. Rather, Kabro submitted its bid and a photocopy of a certified check the day before the sale hearing and actively participated in the hearing at which the alleged collusion took place. Moreover, Kabro is not merely complaining that the bankruptcy court abused its discretion by excluding its bid. Kabro claims that Holiday, Colony and the creditors unlawfully sought to "ensure that no auction would take place" by conspiring to exclude Kabro, the highest bidder at that time, from participating in the sale hearing. This type of conduct, if proven, would call into question the "intrinsic fairness" of the sale hearing. Finally, when collusion occurs between a debtor, creditors and a successful bidder, the unsuccessful bidder may be the only party with an interest in exposing such inequitable conduct.
 
 
 23
 Accordingly, we hold that Kabro has standing to the extent it alleges that Holiday's actions destroyed the "intrinsic fairness" of the sale transaction so that it was not a good faith purchaser.
 
 III. Good Faith Purchaser
 
 24
 Kabro argues that Holiday was not a good faith purchaser of the Property because Holiday conspired with the creditors and Colony to exclude Kabro from the bidding and to fix the price of the Property at an inadequate sum. Holiday counters that Kabro has "identified absolutely no evidence of fraud or collusion in the Record" to support a finding that Holiday was not a good faith purchaser.[2] Holiday further argues that Kabro waived this issue by failing to designate it specifically as an issue to be appealed. Holiday also contends that Kabro is judicially estopped from challenging Holiday's status as a good faith purchaser because Kabro stated in the district court that its appeal would be moot if the district court refused to grant a stay of the sale, thus impliedly conceding that Holiday was a good faith purchaser. However, we do not reach these procedural arguments because, even assuming Kabro's claim is properly before us, we hold that the bankruptcy court did not err in concluding that Holiday was a good faith purchaser.
 
 
 25
 A more detailed explanation of the events that transpired at the sale hearing is required. When the issue of Kabro's participation first arose at the hearing, Colony indicated that it would not support Kabro's participation unless Kabro agreed to the same conditions of sale that Holiday had already accepted, and Kabro agreed additionally to waive an appeal and any title exceptions. G&W, whose contract to purchase the Property for $7.5 million was subject to better offers, then stated that it would not object to Kabro's participation if the bankruptcy court adjourned the hearing "for a week or two" to allow the parties to evaluate Kabro's qualifications. Holiday urged vigorously that Kabro not be allowed to bid because it had not submitted an initial bid. Secured creditor Republic advocated a brief adjournment, provided Kabro would agree to the above-mentioned conditions. However, Republic also urged, in the event the bankruptcy court refused to allow Kabro to bid, that the court reject Holiday's $8.1 million bid as "grossly disproportionate to the true value" of the Property and reopen the bidding.
 
 
 26
 At that point, counsel for Holiday expressed his "surprise[ ]" at Republic's position, and indicated that he "had advised [Republic] before this hearing today, as I had advised counsel for the debtor [Colony], that our minimum bid would be raised to $9.3 million, and I do so on the record." Greater NY, the other secured creditor, then stated that it would not consent to an adjournment, but was willing to allow Kabro to bid. Immediately thereafter, the bankruptcy court denied an adjournment.
 
 
 27
 The court then turned to the remaining issue whether Kabro should be allowed to bid. As already indicated, the parties offered conflicting information in open court about the timeliness and manner of Kabro's attempts to obtain information about the sale and bidding requirements. Thereafter, Republic stated that it had just asked Holiday to increase its bid and reported that "assuming that the Court does not allow Kabro to bid ... [Holiday] would pay $9.6 million for the property, and that they would close notwithstanding a Kabro appeal." Republic then explained that in order to limit "possible disruption of the sale," it would now oppose Kabro's participation in the bidding process because, Republic believed, Kabro would probably not have standing to appeal its exclusion. After a brief recess, G&W stated that it would not raise its bid and that it no longer took any position regarding Kabro's participation.
 
 
 28
 Thereafter, the bankruptcy court found that notice had been proper and refused to allow Kabro to bid on the Property. In its order authorizing sale of the Property to Holiday, the court specifically found that Holiday was a "purchaser acting in 'good faith', as that term is utilized in Section 363(m) of the Bankruptcy Code." On appeal from the bankruptcy court, the district court denied Kabro a stay, finding that notice had been proper and that the bankruptcy court had been justified in excluding Kabro's late bid. Although Kabro challenged the conduct of both Holiday and the creditors at the sale hearing, the district court did not address explicitly whether Holiday had acted in good faith. However, that court noted that "granting the stay and the appeal of [the bankruptcy judge's] order would cast doubt on the bidding procedures and would not be in the public interest."
 
 
 29
 Although § 363(m) requires a successful bidder to have purchased or leased property "in good faith," the Bankruptcy Code does not further define that term. Other circuits have "turned to traditional equitable principles" and held that the "phrase encompasses one who purchases in 'good faith' and for 'value.' " Cumberland Farms Dairy, Inc. v. National Farmers' Org., Inc. (In re Abbotts Dairies of Penn., Inc.), 788 F.2d 143, 147 (3d Cir.1986).
 
 
 30
 We need not spend much time on any claim that Holiday did not pay "value" for the Property. Courts have held that a purchaser who pays "75% of the appraised value of the assets" has tendered value, as that term is used for purposes of § 363(m). Id. at 149 (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1197 n. 1 (7th Cir.1978)). Neither Kabro nor appellees point to any evidence submitted in the bankruptcy court regarding the appraised value of the Property. However, Kabro emphasizes on appeal that it told the district court that it was willing to bid $11.6 million, and its brief to us states that it would have bid as much as $15 million. Nevertheless, none of this was in the record before the bankruptcy court. In that court, the only evidence that the $9.6 million Holiday paid for the Property did not constitute "value" was the $400,000 difference (four percent) between Kabro's bid of $10 million and the purchase price. This was insufficient to demonstrate that Holiday did not pay "value." In any event, the auction price would be sufficient to establish that Holiday paid "value," as long as Holiday acted in good faith, see In re Abbotts, 788 F.2d at 149, an issue to which we now turn.
 
 
 31
 The "good faith" component of the test under § 363(m)
 
 
 32
 speaks to the equity of [the bidder's] conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.
 
 
 33
 In re Rock Indus. Mach. Corp., 572 F.2d at 1198; Mark Bell Furniture Warehouse, Inc. v. D.M. Reid Assoc. (In re Mark Bell), 992 F.2d 7, 8 (1st Cir.1992); In re Abbotts, 788 F.2d at 147-48. Kabro argues that Holiday, the creditors and Colony "effectively insulated from competition" Holiday's bid when Holiday and Republic agreed that Republic would oppose Kabro's participation in the auction sale in exchange for Holiday's agreement to close on the sale notwithstanding pending appeals. In Kabro's opinion, these were bad faith actions in violation of 11 U.S.C. § 363(n), which prohibits agreements between potential bidders that are "intended to control a sale price." See Lone Star Indus., Inc. v. Compania Naviera Perez Companc (In re New York Trap Rock Corp.), 42 F.3d 747, 752 (2d Cir.1994). Kabro thus concludes that Holiday, the creditors and debtor Colony "completely abandon[ed] the auction process in favor of a private collusive agreement which fixed the sale price and excluded a private bidder."
 
 
 34
 Holiday concedes that a bidder who engages in fraud or collusion with respect to the purchase of a debtor's assets does not purchase in good faith. However, Holiday argues that Kabro has adduced no evidence supporting its claims of fraud and collusion, and offers innocent reasons for its actions at the hearing.
 
 
 35
 First, Holiday contests Kabro's allegation that Holiday raised its bid from $8.1 million to $9.6 million solely to exclude Kabro from the bidding. As noted above, Holiday indicated on the record at the sale hearing that it had previously advised Republic and Colony that Holiday would be amenable to raising its bid to $9.3 million, and then entered that bid on the record. Holiday points out that notwithstanding any bid by Kabro, Republic argued at the hearing that the bankruptcy court should reject Holiday's bid of $8.1 million because it did not represent fair value for the Property. The bankruptcy court could properly believe that Holiday increased its bid--at least from $8.1 million to $9.3 million--not because of Republic's agreement to oppose Kabro's participation but because Holiday was faced with the prospect of losing the Property even if Kabro was not allowed to bid. Holiday observes that its bid was not completely insulated from competition because G&W was still in the bidding when Holiday raised its bid from $9.3 million to $9.6 million in exchange for Republic's opposition to Kabro's participation.
 
 
 36
 In addition, appellees offer a plausible reason why Republic favored Holiday's $9.6 million bid, even though it was $400,000 less than Kabro's bid. During the first four years of the bankruptcy proceedings, Colony's assets were virtually unsaleable due to (1) depressed real estate values, (2) two contracts which designated Marriot International the management company for the WindWatch Hotel and Golf Course for 75 years, and (3) multiple disputes regarding, among other things, sewage facilities on the Property and the priority of certain liens. Because the final sale agreement was structured to accommodate these competing interests, the creditors wanted the certainty of knowing that the successful bidder would see the sale through to closing. Indeed, the notice and bidding procedures required a bidder to submit with its initial bid a statement of financial capability and industry reputation regarding similar deals. It thus seems reasonable--after the bankruptcy court ruled that it would not adjourn the hearing to allow the parties to investigate Kabro's offer--that Republic favored the bid of Holiday, whose credentials it had already examined, over that of Kabro, who did not submit such information until shortly before the day of the hearing.
 
 
 37
 Moreover, despite allegations by Kabro of secret, conspiratorial dealings between Holiday, Colony and the creditors, all relevant facts regarding the parties' bids and positions were disclosed to the bankruptcy court. Many courts ruling on challenges to a purchaser's good faith status have focused on whether the acts about which the appellant complained were disclosed to the bankruptcy court. Thus, in Tri-Cran, Inc. v. Fallon (In re Tri-Cran), 98 B.R. 609 (Bankr.D.Mass.1989), on which Kabro relies, the court repeatedly stressed in finding a lack of good faith that the bidder and debtor not only concealed their relationship and collusive scheme from the bankruptcy court, but actually misrepresented facts to that court. Id. at 619-21; see also G-K Development Co. v. Broadmoor Place Invs., L.P. (In re Broadmoor Place Invs., L.P.), 994 F.2d 744, 746 (10th Cir.1993) (no "collusion" where contract between bidder and debtor "was specifically set forth" in bid reviewed by bankruptcy court); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y.1988) (court was "hard pressed" to find bad faith when challenged relationship between bidder and debtor "was fully disclosed to the Bankruptcy Court"). Similarly, in In re New York Trap Rock, we suggested that § 363(n) prohibits secret cooperation between bidders, 42 F.3d at 752, noting that the bidders in that case had not disclosed an agreement between them to either the bankruptcy court or the debtor, id. at 750.
 
 
 38
 In this case, Republic explained to the bankruptcy court during the sale hearing that Holiday's $9.6 million bid and agreement to waive an appeal and title exceptions were "conditioned on our opposing Kabro's bid." Although full disclosure to the bankruptcy court may not always neutralize conduct that would otherwise constitute bad faith, disclosure should certainly weigh heavily in a bankruptcy court's decision on that issue.
 
 
 39
 Because this complicated liquidation involved the resolution of various protracted disputes concerning the Property, there was pressure to conclude the sale expeditiously. Faced with Kabro's last-minute motion to submit a bid, the bankruptcy court solicited the views of the other interested parties and heard argument regarding sufficiency of the notice of the sale and Kabro's excuse for missing the initial bid deadline. Ultimately, Kabro was excluded from the bidding not by a "conspiracy" between Holiday and the creditors, but by the bankruptcy court's decision that under all the circumstances notice had been proper and Kabro's failure to follow the bidding procedures precluded its participation.
 
 
 40
 Although we caution that bankruptcy judges should remain alert to the possibility of fraud or collusion with respect to the sale of a debtor's property, we cannot conclude here that the bankruptcy judge, who had presided over these proceedings for many years and who had before him all the facts underlying Kabro's appeal, erred in finding that Holiday was a good faith purchaser.
 
 
 41
 Affirmed.
 
 
 
 [1]
 There seems to be some confusion over whether Holiday's initial bid was for $8.1 million or $8.15 million. However, there has been no suggestion that Holiday failed to satisfy the minimum bid requirement
 
 
 [2]
 Holiday also points out that toward the end of the sale hearing, Kabro attempted to purchase G&W's bid on the Property, and argues that "[f]or all its ad hominem attacks of fraud and collusion, Kabro's own hands are thus hardly clean." We need not resolve this issue